**WHOLE FOODS MARKET SOUTHWEST, L.P. f/k/a Whole Foods Market Southwest, Inc., Appellant,**

v.

**Elaine M. TIJERINA, Appellee.**

No. 14–96–00623–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 22, 1998.

Rehearing Overruled Dec. 3, 1998.

Richard A. Valdes, Dallas, for appellant.

Steven Ralph Baker, James Smith, Kimberly A. Warren, Houston, for appellee.

Before YATES, ANDERSON, and EDELMAN, JJ.

## OPINION

ANDERSON, Justice.

This case involves the wrongful termination of an employee for which a jury awarded compensatory and punitive damages. Appellant, Whole Foods Market Southwest, L.P., f.k.a. Whole Foods Market Southwest, Inc. ("WFM"), appeals from the judgment entered on the jury verdict in favor of appellee, Elaine M. Tijerina ("Tijerina"). We modify the judgment of the trial court and affirm that judgment as modified.

### I. Background

Tijerina was an employee in the deli department at WFM's Wilcrest store in Houston. Tijerina was working the morning shift on Sunday, May 1, 1994, when she was injured. As part of her duties, Tijerina removed the porcelain bowls of food from the deli display case and placed them on a cart to take to the kitchen to refill. As Tijerina was lifting a porcelain bowl from the cart to a table in the kitchen, a piece of the bowl broke off and lacerated the fifth finger of her right hand to the bone.[1]

---

1. According to Tijerina, a loose piece of the bowl had been reattached with masking tape. Tijerina asserted that WFM was not replacing broken bowls because it had instituted a spending freeze. WFM disputed that any cracked or broken bowls were reused. Instead, WFM claimed the spending freeze did not include deferring the replacement of cracked or broken bowls. The notice of the spending freeze from the store's managers to the employees provided:

 It's time for us to tighten the belt a notch or two. *Until further notice the store is on a spending freeze.* This means that we will spend money on necessities only! *This includes your packaging budgets.* The only thing you should be using your packaging budgets for are cleaning supplies, packaging such as film wrap, to go containers, napkins, etc., linen, and for JB, Deli, and Bakery repairs. I know that some teams are using their budgets to buy other stuff like display props, baskets, etc. Please discontinue this practice until further notice. At this point the store will not make any expenditures except on minimal office supplies, essential repairs. Please do not make any requests for expenditures unless it is absolutely necessary. If you can get by without making an expense please do so. By the way, we acquired massive fixtures as a result of the reset. Please feel free to use this stuff if necessary. If you have any questions feel free to ask me. Also we will discuss this at next WLN. (emphasis in original).

Tijerina testified she did not take an ambulance to the hospital because Stuart Easterling ("Easterling"), the shift manager on duty at the time of the accident, determined an ambulance was too costly. Instead, Easterling drove Tijerina to the hospital. At the hospital, Tijerina saw Dr. James Beutnagel ("Dr.Beutnagel"), who stitched her finger, gave her a prescription for a pain medication, Darvoset, and referred her to a plastic surgeon, Dr. German Newell ("Dr.Newell"). Tijerina saw Dr. Newell on May 3, 1994. At that time, Dr. Newell prescribed a generic form of Vicodin, another pain medication. On May 4, 1994, Dr. Newell performed surgery on Tijerina's hand. Tijerina received 22 stitches and her hand was placed in a cast. During the course of the following week, Dr. Newell gave Tijerina several more prescriptions for Vicodin.[2] Dr. Newell also prescribed physical therapy.

A few days after her surgery, Mark Dixon ("Dixon"), the "store team leader" (store manager), asked Tijerina to return to work and answer the phones. In the meantime, WFM had been sending Tijerina's medical bills to Tommy Sautter ("Sautter") of Sautter & Sautter, a risk management firm employed by WFM, for approval for payment.[3] According to David Quisenberry ("Quisenberry"), the "assistant store team leader" (assistant manager), Sautter contacted him because he was concerned about the amount of pain medication that had been prescribed to Tijerina and her ability to perform light duties while taking the medication. Quisenberry discussed with Dixon his conversation with Sautter.

Subsequently, Dixon and Quisenberry met with Tijerina on May 13, 1994. Tijerina testified they inquired into why she was taking so much pain medication. Tijerina, who was nervous that she was going to lose her job, told them she had not taken all the Vicodin, but had given it to her husband and other people, whose identities she would not disclose. At this point, Dixon placed Tijerina on medical leave of absence.

On May 18, 1994, Dixon and Quisenberry again met with Tijerina. Both Dixon and Quisenberry considered Tijerina's distribution of her medication as an act of theft because WFM had paid for the medication for the purpose of helping Tijerina recover

2. Dr. Newell prescribed 30 generic Vicodin on May 3, 1994; 40 Vicodin on May 4, 1994; 20 Vicodin on May 6, 1994; 20 Vicodin on May 10, 1994; and 40 Vicodin on May 12, 1994. Dr. Newell instructed Tijerina to take one to two tablets every two to three hours as needed. As previously noted, Dr. Beutnagel prescribed 20 Darvoset on May 1, 1994. Tijerina testified that Dr. Newell prescribed Vicodin after Dr. Beutnagel had prescribed Darvoset because the Darvoset upset her stomach.

3. The following stipulation between WFM and Tijerina regarding Sautter & Sautter's role as WFM's agent was read to the jury by Tijerina's counsel:
 1. Sautter & Sautter, Inc. business address is 15770 Dallas Parkway, Suite 904, Dallas, Texas, 75248; and
 2. At all times relevant to this lawsuit, Sautter & Sautter, Inc. was acting under contract with Defendant, WHOLE FOODS MARKET SOUTHWEST, L.P.; and
 3. At all times relevant to this lawsuit, Sautter & Sautter, Inc. was acting as an agent and/or representative for Defendant, WHOLE FOODS MARKET SOUTHWEST. L.P.; and
 4. At all relevant times to this lawsuit, Sautter & Sautter, Inc. was in the business of risk management for Defendant, WHOLE FOODS MARKET SOUTHWEST, L.P.; and
 5. Sautter & Sautter, Inc. as part of being a business risk manager for Defendant, WHOLE FOODS MARKET, L.P., gave advice to Defendant, WHOLE FOODS MARKET SOUTHWEST, L.P., with respect to terminating Defendant's employees; and
 6. Sautter & Sautter, Inc. was acting within the scope of its agency/representation relationship with Defendant, WHOLE FOODS MARKET, L.P. at all times during the investigation of the Plaintiff, ELAINE TIJERINA'S injury and her subsequent termination; and
 7. In May, 1994, Sautter & Sautter, Inc as risk manager acting within the scope of its agency/representation relationship with Defendant, WHOLE FOODS MARKET SOUTHWEST, L.P. advised Defendant, WHOLE FOODS MARKET SOUTHWEST, L.P. that it had cause to terminate Plaintiff, ELAINE TIJERINA'S employment; and
 8. Defendant, WHOLE FOODS MARKET SOUTHWEST, L.P. after receiving advice from Sautter & Sautter, Inc. terminated Plaintiff ELAINE TIJERINA; and
 9. For purposes of this lawsuit, Defendant, WHOLE FOODS MARKET SOUTHWEST, L.P. agrees that it is responsible for any actions of its agent Sautter & Sautter. Inc.

from her injury. Tijerina testified that she told them she had lied when she said she had given away her pain medication because she was afraid of losing her job for taking too much medication. Tijerina further claimed Dixon and Quisenberry would not let her leave the meeting until she had signed an employment termination letter stating she had distributed her pain medication.[4] Both Dixon and Quisenberry testified they would not have fired her for taking all the pain medication. Furthermore, they both denied that Tijerina had told them she had lied about giving away her pain medication.

On January 20, 1995, Tijerina filed suit against WFM, alleging claims of negligence and gross negligence with respect to her injury and retaliatory discharge in violation of Section 451.001 of the Texas Labor Code for seeking medical care for her injury. *See* TEX. LAB.CODE ANN. § 451.001 (Vernon 1996). The jury returned a verdict finding: (1) WFM's negligence proximately caused Tijerina's injury and awarded her $20,000.00 in future medical costs; (2) WFM terminated Tijerina because she sought medical care for her injury and awarded her $16,000.00 in compensatory damages; and (3) WFM's termination of Tijerina was malicious and awarded her $100,000.00 in punitive damages. The jury, however, did not find WFM grossly negligent.

WFM filed a notice of limited appeal in accordance with Rule 40(a)(4) of the Texas Rules of Appellate Procedure.[5] In six points of error, WFM contends the trial court erred

by allowing the submission of jury questions 7 and 8 because they were not supported by the pleadings, and were not tried by consent; allowing Tijerina to file her first amended original petition post-verdict; entering judgment for Tijerina on the verdict of malicious or willful conduct and on the award of punitive damages because no evidence supported the special issue of malicious or willful termination of employment; and entering judgment awarding future medical costs because no evidence supported the award. WFM does not challenge the award of compensatory damages for past and future lost wages, employment benefits, and mental anguish.

## II. Viability of Retaliatory Discharge Claim

■ Before we can reach the merits of WFM's points of error, we must address a threshold issue affecting the viability of Tijerina's claim that her discharge was retaliatory and, concomitantly, the award of the damages related to that claim. In post-submission briefing, WFM directs our attention to the recent Texas Supreme Court case of *Texas Mexican Ry. Co. v. Bouchet,* in which the court held an employee has no cause of action under the anti-retaliation statute, Texas Labor Code section 451.001 (formerly TEX.REV.CIV. STAT. ANN. art. 8307), against an employer who is a non-subscriber to the Texas Workers' Compensation Act. *See* 963 S.W.2d 52, 57 (Tex.1998). Based on the court's holding in *Bouchet,* WFM, as a non-subscribing employer, seeks reversal of the

---

4. The termination letter stated:

> Based on the circumstances of the following:
> 1. In a meeting on Friday, May 13 th, 1994 as about 4:15 PM you admitted, in the presence of David Quisenberry and Mark Dixon, to giving out your prescribed pain killers to your husband and others whom you refused to name. You were prescribed these painkillers to reduce your pain as a result of an injury to your pinky finger. These pain killers were prescription only which classifies them as a controlled substance. Since Whole Foods Market Southwest is paying for these prescriptions, these prescriptions are the property of Whole Foods Market to be used by Elaine Tijerina related to her finger injury. Since you distributed these prescribed pain killers to unauthorized persons, a major infraction of Whole Foods Southwest, inc. [sic] policy [has occurred].

> It will be necessary to terminate your employment with Whole Foods Market Southwest inc. [sic] immediately.
> Whole Foods Market Southwest will continue to pay for your Medical bills related to your pinky finger injury which occurred on May 1 st , 1994. We will only pay bills referenced to Dr. G Newall [sic]. You must keep us informed once a week and forward all medical information that you receive.
> This letter is strictly confidential between Whole Foods Market Southwest and Elaine Tijerina.

5. We note that the recently amended Texas Rules of Appellate procedure, effective September 1, 1997, no longer provide for a notice of limited appeal. This appeal was perfected on April 15, 1996, prior to the effective date of the amended rules.

award of not only punitive damages on Tijerina's retaliatory discharge claim, but also of the award of the compensatory damages on that claim.

 Generally, the Texas Supreme Court's decisions apply retroactively, unless the Supreme Court exercises its discretion to modify its application. *See Bowen v. Aetna Cas. & Sur. Co.*, 837 S.W.2d 99, 100 (Tex. 1992); *see also Texas Boll Weevil Eradication Foundation, Inc. v. Lewellen*, 952 S.W.2d 454, 503 (Tex.1997) (supplemental opinion on rehearing). When the applicable law changes during the pendency of an appeal, the court of appeals must render its decision in light of the change in the law. *See Blair v. Fletcher*, 849 S.W.2d 344, 345 (Tex.1993); *Lubbock County v. Strube*, 953 S.W.2d 847, 858 (Tex.App.—Austin 1997, pet. for review filed).

Tijerina asserts WFM did not preserve this complaint for appeal because it did not raise this issue in the trial court. WFM contends it could not have been "aware of its right to challenge [Tijerina's] cause of action under Section 451.001" because at the time Tijerina filed her lawsuit, two courts of appeals had already held an employee could recover from a nonsubscribing employer for retaliatory discharge. *See Texas Health Enters., Inc. v. Kirkgard*, 882 S.W.2d 630, 633 (Tex.App.—Beaumont 1994, writ denied); *Hodge v. BSB Inv., Inc.*, 783 S.W.2d 310, 313 (Tex.App.—Dallas 1990, writ denied). Moreover, the Texas Supreme Court, acknowledging that the court of appeals in *Hodge* had "suggested" an employee may maintain a claim for retaliatory discharge against a nonsubscribing employer, stated "We have assumed, because we need not decide in this case, that employees of nonsubscribers are protected by section 451.001." *Gunn Chevrolet, Inc. v. Hinerman*, 898 S.W.2d 817, 819 (Tex.1995).[6]

We agree with Tijerina. WFM, by failing to object to the trial court, waived its right to raise this complaint on appeal. WFM could have easily argued in the trial court it was not liable because it was a nonsubscri-ber to the workers' compensation act. Although *Texas Health* and *Hodge* were "considerable authority," they were not binding on this court. Similarly, the Texas Supreme Court in *Gunn Chevrolet* passed on deciding the issue, leaving it open for later determination. *See* 898 S.W.2d at 819. After all, the Texas Mexican Railway Company objected during the trial, and having preserved the issue for appeal, raised the issue with the court of appeals in spite of *Hodge* and *Gunn Chevrolet*. *See Bouchet v. Texas Mexican Ry. Co.*, 915 S.W.2d 107, 109–11 (Tex.App.—San Antonio 1996). Simply by preserving its complaint for appellate review, the Texas Mexican Railway was able to challenge and ultimately defeat the holding of *Hodge* and *Texas Health* regarding the protection of employees of nonsubscribers under section 451.001. *See Bouchet*, 963 S.W.2d at 57.

The First Court of Appeals addressed an argument similar to the one WFM raises here. *See Jones v. Jones*, 888 S.W.2d 858, 859–60 (Tex.App.—Houston [1 st Dist.] 1994, writ denied). The appellant in *Jones* raised on appeal for the first time, several months after the submission of the case but before the issuance of an opinion, a complaint that the trial court had held a hearing on the appellee's motion for summary judgment one day too soon. *Id.* at 859. The Texas Supreme Court's rendering a decision favorable to the appellant's position prompted the appellant to raise the issue. *Id.* Observing that the appellant had failed to object to the hearing date in her untimely response to the appellee's motion for summary judgment and in her two motions for a new trial, the *Jones* court found the appellant had waived any argument on appeal that she had received less notice than required for the summary judgment hearing. *Id.*

Moreover, the appellant, claiming she failed to raise any objection to the trial court on the issue because the First Court of Appeals had previously decided the issue contrary to her position, stated " 'even this Court would have ruled against her based upon its previous decision.' " *Id.* The *Jones*

---

6. The issue in *Gunn Chevrolet* was whether § 451.001 "imposes liability on a nonsubscribing employer under the Workers' Compensation Act for discharging an employee injured on the job when the employer did not cause the injury." *See* 898 S.W.2d at 818.

court addressed appellant's argument in the following manner: "[t]his argument misses the point. Error regarding the receipt of less notice than required for a hearing on a motion for summary judgment is *preserved in the trial court..* .[T]he existence of law contrary to [the appellant's] position is no reason why she could not have made her argument in the trial court and later to this Court." *Id.* at 859–60 (emphasis in the original).

The analysis in *Jones* is even more compelling here where neither this court nor the First Court of Appeals had addressed the viability of a retaliatory discharge claim against a nonsubscribing employer. We do not believe *Gunn Chevrolet, Texas Health,* or *Hodge* in any way precluded WFM's right to challenge Tijerina's retaliatory discharge claim. WFM has failed to preserve error on its claim that Tijerina may not recover on a cause of action for wrongful termination under Section 451.001 of the Texas Labor Code.[7]

### III. Trial Amendment

■ We will address WFM's third point of error first because our disposition of it controls our disposition of WFM's first two points or error. In its third point of error, WFM claims the trial court erred in allowing Tijerina to file a post-verdict trial amendment. WFM maintains that Tijerina's first amended original petition asserted a new and distinct cause of action based upon malicious or willful conduct in her discharge, which was not alleged in her original petition. WFM, however, did not raise any complaints regarding Tijerina's failure to plead malicious termination until after the close of evidence, when the trial court heard arguments on the motions for a directed verdict. The trial court allowed submission of the questions on malicious termination and punitive damages to the jury.

With respect to her retaliatory discharge claim, Tijerina pleaded in her original petition:

Elaine Tijerina was hired by Whole Foods to work in the deli department of the store. Plaintiff worked for Defendant until approximately one week after her injury when she was wrongfully terminated.

Elaine Tijerina's employment was improperly terminated by Defendant Whole Foods. Defendant Whole Foods wrongfully terminated Plaintiff because she made a claim against Whole Foods in connection with the injuries described above which she sustained while working for Whole Foods. This termination is wrongful as a retaliation and a violation of TEX. LAB. CODE § 451.001 (Workers' Compensation "Retaliatory Discharge" provision, formerly § 8307c).

\* \* \*

As a result of the wrongful termination by Defendant, Plaintiff has suffered damages. These damages include loss of her salary and benefits from the time of her firing until she was able to attain employment elsewhere; mental anguish and despair; damage to her reputation which has resulted in difficulty obtaining new employment; all of which damages have occurred in the past since the time of her termination and will, in reasonable probability, continue into the future.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Defendant be cited in terms of the law to appear and answer herein and that upon final trial of the cause that Plaintiff have judgment against the Defendant WHOLE FOODS MARKET SOUTHWEST, INC. for her injuries, lost compensation, mental anguish, and all other reasonable damages, actual and punitive, which Plaintiff has sustained and will reasonably sustain in the future as a result of Defendant's

7. The Austin Court of Appeals, while acknowledging that when the applicable law changes during the pendency of an appeal the court of appeals must render its decision in light of the new law, nevertheless examined the objection at trial to determine whether the appellant had preserved error in the trial court so that the new law announced by the Texas Supreme Court could be applied. *See Strube,* 953 S.W.2d at 858.

wrongful and/or retaliatory discharge (a violation of Texas Labor Code § 451.001) and Defendant's negligence and gross negligence....

Although Tijerina believed her original petition provided sufficient notice to WFM of her claim for punitive damages for retaliatory discharge, Tijerina, nonetheless, moved for leave to file a trial amendment several days after the jury returned its verdict, expressly pleading malicious termination in support of her request for punitive damages.[8] The trial court, finding that WFM had not shown it was surprised by Tijerina's claim for punitive damages for malicious termination, granted Tijerina leave to file her trial amendment.

■■■ Under Rule 63 of the Texas Rules of Civil Procedure, a party may amend its pleadings after the verdict, but before the trial court has entered judgment unless the opposing party establishes surprise.[9] *See Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938, 940 (Tex.1990). Rule 66 further provides that if a party objects to evidence on the ground that it is outside the issues framed by the pleadings, the court may allow the amendment and shall do so freely when the presentation of the merits will be subserved thereby and the objecting party fails to satisfy the court that the amendment would prejudice that party in maintaining an action or defense on the merits.[10] The trial court, therefore, has no discretion to refuse a post-verdict trial amendment unless: (1) the opposing party presents evidence of surprise or prejudice, or (2) the amendment asserts a new cause of action or defense and, there-

8. In her First Amended Original Petition, Tijerina "clarified" her claim for punitive damages:

Plaintiff's employment was improperly terminated by Whole Foods. Whole Foods wrongfully terminated Plaintiff because she made a claim against Whole Foods in connection with the injuries described above which she sustained while working for Whole Foods. This termination is wrongful as a retaliation and a violation of TEX LAB. CODE § 451.001 (Workers' Compensation "Retaliatory Discharge" provision, formerly § 8307). *Whole Foods acted willfully and/or maliciously in terminating Plaintiff from her employment and is thus, liable for exemplary (punitive) damages.*
\* \* \*
As a result of the wrongful termination by Whole Foods, *including Whole Food's [sic] willful and/or malicious conduct*, Plaintiff has suffered damages. These damages include but are not limited to, loss of her salary and benefits from the time of her firing until she was able to attain employment elsewhere; mental anguish and despair; damage to her reputation which has resulted in difficulty obtaining new employment; all of which damages have occurred in the past since the time of her termination and will, in reasonable probability continue into the future.
WHEREFORE, PREMISES CONSIDERED, your Plaintiff, **ELAINE M. TIJERINA**, prays that Defendant, **WHOLE FOODS MARKET SOUTHWEST, INC. (WHOLE FOODS SOUTHWEST, L.P.)** be cited to appear and answer herein as the law directs, and that upon final hearing:
(1) Plaintiff have and recover judgment of and from the Defendant for all actual damages incurred and for punitive damages in excess of the minimum jurisdictional limits of this Court as a result of Plaintiff's injury to her finger;

(2) Plaintiff have and recover judgment of and from the Defendant for all actual damages incurred and for *exemplary (punitive) damages* in excess of the minimum jurisdictional limits of the Court as a result of Plaintiff's wrongful termination and Defendant's *willful and/or malicious conduct.*
(emphasis added).

9. Rule 63 states:

Parties may amend their pleadings, respond to the pleadings on file of other parties, file suggestions of death and make representative parties, and file such other pleas as they may desire by filing such pleas with the clerk at such time as not to operate as a surprise to the opposite party; provided, that any pleadings, responses or pleas offered within seven days of the date of trial or thereafter, or after such time as may be ordered by the judge under Rule 166, shall be filed only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposite party.

10. Rule 66 states:

If evidence is objected to at the trial on the ground that it is not within the issues made by the pleading, or if during the trial any defect, fault or omission in a pleading, either of form or substance, is called to the attention of the court, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the allowance of such amendment would prejudice him in maintaining his action or defense upon the merits. The court may grant a postponement to enable the objecting party to meet such evidence.

fore, is prejudicial on its face and the opposing party objects to it. *See Chapin & Chapin, Inc. v. Texas Sand & Gravel Co.*, 844 S.W.2d 664, 665 (Tex.1992); *Hardin v. Hardin*, 597 S.W.2d 347, 349 (Tex.1980); *Lege v. Jones*, 919 S.W.2d 870, 875 (Tex.App.—Houston [14 th Dist.] 1996, no writ) (citing *Greenhalgh*, 787 S.W.2d at 939). The burden of showing surprise or prejudice rests on the party opposing the amendment. *See State Bar of Texas v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex.1994); *Greenhalgh*, 787 S.W.2d at 939.

■ An amendment is mandatory if it is merely procedural in nature such as conforming the pleadings to the evidence at trial. *See Chapin & Chapin, Inc.*, 844 S.W.2d at 665. An amendment is not mandatory if it is substantive, *i.e.*, changing the nature of the trial. *Id.* The trial court's decision to allow or deny the amendment may be reversed only if it is a clear abuse of discretion. *See Kilpatrick*, 874 S.W.2d at 658; *Greenhalgh*, 787 S.W.2d at 939.

A review of counsels' arguments at the hearing on Tijerina's motion for leave to file her first amended original petition reveals WFM's admission that it was not surprised by Tijerina's claim for punitive damages for retaliatory discharge:

MR. BAKER: Your Honor, may I say one thing at this point, just to sort of clarify what was said off the record before we had the court reporter in here and that was that we discussed the issue of surprise and, in fact, counsel for the Defendant had admitted that they were not surprised by our allegations of willful and malicious conduct and our request for punitive and exemplary damages having to do with the termination, is that correct, counsel?

MR. HEARD: Your Honor, I'd have to admit I prepared the charges and I had prepared alternatives for the Court to review, which we discussed.

The problem that I have again, so the record is clear, I do not think those charges should have been submitted to you because the defense, Transportation Insurance Company v. Moriel and Universal vs. Ung, those two cases you deliberated over were not before—I do not believe those questions should have ever been submitted to the jury on those points.

And I won't belabor the point but, no, I was not surprised that they were trying to get punitive damages on the wrongful termination.

MR. BAKER: Thank you, Your Honor.

MR. HEARD: I would not agree that it was procedurally correct the way they've gone about it to clear up the problem because I invited the opportunity to do a trial amendment and asked them. And now they come in after the fact to do it, I don't particularly agree with that procedure, but it's been done.

WFM, however, contends that surprise is not the issue, but instead, maintains that Tijerina asserted a new cause of action in her post-verdict trial amendment, which is prejudicial on its face. WFM claims that because such issue was not tried by consent, it was an abuse of discretion to allow the post-verdict trial amendment. *See Libhart v. Copeland*, 949 S.W.2d 783, 797 (Tex.App.—Waco 1997, no writ) (citing *Bell v. Meeks*, 725 S.W.2d 179 (Tex.1987)).

Recently, the Dallas court of appeals analyzed the trial court's discretion in denying or allowing a trial amendment. *See Smith Detective Agency & Nightwatch Serv., Inc. v. Stanley Smith Sec., Inc.*, 938 S.W.2d 743 (Tex.App.—Dallas 1996, writ denied). Although the plaintiff in *Smith Detective Agency* attempted to file the trial amendment prior to the submission of the case to the jury, we find its analysis is relevant to the facts in this case.

■ Under Rule 66, three conditions must be satisfied before the trial court has any discretion to deny a trial amendment. *Id.* at 748. First, the party seeking the amendment must seek leave of the trial court to file the amendment. *Id.* (citing *American Pozzolan Corp. v. Desert Trucking Co.*, 450 S.W.2d 433, 435 (Tex.Civ.App.—San Antonio 1970, writ ref'd n.r.e.)). Second, the party opposing the trial amendment must timely object to the filing of the amendment. *Id.* (citing *Greenhalgh*, 787 S.W.2d at 940–41). Third, the party opposing the amendment must show the filing of the amendment would

be prejudicial. *Id.* A proposed trial amendment which asserts a new cause of action may be prejudicial on its face. *Id.* at 749 (citing *Hardin,* 597 S.W.2d at 349). Merely because an amended pleading asserts a new cause of action, however, does not make it prejudicial to the opposing party as a matter of law. *Id.* (citing *Kilpatrick,* 874 S.W.2d at 658). Rather, the amendment must be evaluated in the context of the entire case.

The *Smith Detective Agency* court further explained that an amendment prejudicial on its face has three defining characteristics ascertainable from the amendment viewed in the context of the record. First, the amendment must assert a new substantive matter that reshapes the nature of the trial itself. *Id.* (citing *Chapin & Chapin, Inc.,* 844 S.W.2d at 665; *Hardin,* 597 S.W.2d at 349). Procedural matters or recast assertions do not constitute new substantive matters. "Even an additional, separately stated cause of action or defense may not be a new substantive matter if it has common elements with matters previously asserted and the evidentiary proof required to support it is the same for an already pleaded cause of action or defense." *Id.* (citing *Kilpatrick,* 874 S.W.2d at 658).

Second, the new matter asserted must be of such a nature that the opposing party could not have anticipated it in light of the development of the case up to the time the amendment was requested. *Id.* (citing *Hardin,* 597 S.W.2d at 350). "[M]erely because the opposing party did not anticipate the issues in the amendment is not the test. The question is whether the opposing party *could* have anticipated the newly asserted matter as revealed by the record of the case." *Id.* (emphasis in the original). Third, the opposing party's presentation of the case would be detrimentally affected by the filing of the amendment. *Id.* (citing *Hardin,* 597 S.W.2d at 350).

Here, WFM has the burden to establish that Tijerina's trial amendment prejudiced its case. WFM has failed to meet that burden. First, WFM has not shown that it could not have anticipated that Tijerina would request punitive damages for retaliatory discharge. Tijerina raised the issue in

her proposed jury questions; both Tijerina and WFM addressed malicious termination in their opening arguments; and WFM objected to the submission to the jury of the questions regarding malicious termination on the basis of the sufficiency of the evidence. Indeed, WFM fully admitted at the hearing on Tijerina's trial amendment that it knew that Tijerina was seeking punitive damages for her retaliatory discharge claim.

Second, WFM has not established that Tijerina's claim for malicious termination changed the nature of the trial. The issues in this case are based on a limited nucleus of facts. WFM has neither shown that it would have tried its case any differently from the way it did, nor has it set forth what additional evidence, if any, it would have presented to rebut Tijerina's malicious termination. Moreover, WFM, in objecting to the postverdict trial amendment, has not shown that its pretrial preparation was made in reliance on Tijerina's allegations in her original petition and decided not to pursue other avenues of pretrial investigation it would have otherwise made. *See Ortale v. City of Rowlett,* 696 S.W.2d 640, 642 (Tex.App.—Dallas 1985, writ ref'd n.r.e.).

Because Whole Foods has failed to establish either surprise or prejudice, we find it was not an abuse of discretion for the trial court to allow Tijerina's post-verdict trial amendment. WFM's third point of error is overruled.

## IV. Pleading Cause of Action

We now turn to WFM's points of error one and two. In its first point of error, WFM claims it was error for the trial court to overrule its objection to Jury Question No. 7 regarding malicious or willful conduct with respect to Tijerina's claim for wrongful termination. WFM challenges the submission of Jury Question No. 7 on the basis that the issue was neither supported in Tijerina's pleadings nor tried by consent. In its second point of error, WFM contends the trial court erred in overruling its objection to Jury Question No. 8 on punitive damages for malicious or willful conduct for wrongful termination. WFM argues that because Jury Question No. 8 was predicated on an affirma-

tive finding on malicious conduct in the termination of Tijerina under Jury Question No. 7, it was error for the trial court to submit Jury Question No. 8.

Because we hold the trial court did not err when it permitted Tijerina's post-verdict trial amendment, we need not address appellant's assertion in points of error one and two that jury questions 7 and 8 are not supported by the pleadings. When an amended petition is filed, it supplants all former petitions, which are no longer regarded as part of the pleadings. See TEX. R. CIV. P. 65; *CIGNA Ins. Co. v. TPG Store, Inc.,* 894 S.W.2d 431, 434 (Tex.App.—Austin 1995, no writ). Because Tijerina's first amended original petition pleads malicious termination in support of her request for punitive damages, and that pleading superceded the original petition, the amended original petition supplies the support necessary for jury questions 7 and 8. WFM's first and second points of error are overruled.

### V. Punitive Damages

In its fourth point of error, WFM asserts it was error for the trial court to enter judgment on the verdict of malicious or willful conduct because there was no evidence to support the finding that Tijerina's discharge was based upon willful or malicious conduct. WFM, in its fifth point of error, claims the trial court erred in entering judgment for punitive damages in the amount of $100,000.00 for malicious and willful conduct in terminating Tijerina because such award was contingent on a finding that WFM's conduct in terminating Tijerina was malicious.

When reviewing a challenge to the legal sufficiency of evidence, *i.e.,* a "no evidence" point of error, the reviewing court may consider only the evidence and inferences that support the challenged findings and should disregard all evidence and inferences to the contrary. See *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995). If there is more than a scintilla of evidence to support the finding, the claim is sufficient as a matter of law, and any challenges merely go to the weight of the

evidence. See *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. See *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998). The court may sustain a "no evidence" point of error if the record reveals one of the following:

(1) a complete absence of evidence of a vital fact;

(2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact;

(3) the evidence offered to prove a vital fact is no more than a scintilla; or

(4) the evidence established conclusively the opposite of the vital fact.

*Id.; Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex. 1990).

The Texas Supreme Court recently set forth the standard for awarding punitive damages in a retaliatory discharge case:

[A]ctual malice must be shown before punitive damages may be assessed against an employer for violating section 451.001. By requiring evidence of ill-will, spite, or a specific intent to cause injury to the employee, courts will ensure that only egregious violations of the statute will be subject to punitive awards.

*Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 454 (Tex.1996). In reaching this standard, the court recognized that an employer's violation of § 451.001 is an unlawful or wrongful act, but:

"[t]he fact that an act is unlawful is not of itself ground for an award of exemplary or punitive damages. The act complained of not only must be unlawful but also must partake of a wanton and malicious nature, or, as sometimes stated, somewhat of a criminal or wanton nature, and an act will not be deemed malicious, and so warranting punitive damages, merely because it is unlawful or wrongful."

*Id.* (quoting *Jones v. Ross*, 141 Tex. 415, 173 S.W.2d 1022, 1024 (1943)).

The circumstances surrounding Tijerina's discharge supports Tijerina's claim that WFM's conduct was malicious. Tijerina described the meeting wherein she confessed to distributing her pain medication to her friends:

> They—DQ and Flash, took me into the office and asked about why I was taking so much pain medication, that it seemed to them that there was far too much pain medication that I was using and wanted to know why. And I asked them at first, I asked them if they had seen the picture of my finger. And I still had my hand in the cast, so I couldn't actually show them.

> And they said, "Yeah, but that's entirely too much pain medication for one person to take. It seems to me that if you were taking that amount of pain medication you wouldn't be able to walk up and down the stairs, and you wouldn't be able to do your duties." And they just kept asking me, you know, that—well, telling me, actually, that I was taking too much pain medication.

> And I started feeling very nervous, and I got scared. I thought I was going to lose my job. I thought they were going to fire me right then because they just kept asking me about it and telling me that it was entirely too much, that nobody, no one person could keep taking that amount of medication and be walking around.

> \* \* \*

> Yeah. Well, I got to the point where I was really nervous and really upset about it. And the way that they were talking was that they were going to have to let me go if I was going to continue to take this amount of medication.

> So I told them that, "Well, I didn't take all of them myself. I gave some of them away." So that—that seemed—then they stopped asking me where all the medication went.

With regard to the second termination meeting, Tijerina testified that she was not allowed to leave until she had signed the "confession" letter:

> The other door was already shut, and they sat me down, and they told me that in regard to my medical leave and the medication that I was taking and what I had done with the medication and the fact of distributing it they would have to terminate me.

> And I told them that I didn't really. I just said that because I was upset and I was scared that I was going to lose my job and that I lied to them about it. And I said it because I was scared they were going to fire me.

> \* \* \*

> They pushed this piece of paper towards me and told me that they were going to have to terminate me anyways [sic].

> \* \* \*

> I was very upset. I didn't want this to happen, and I wanted to try to explain to them that I didn't want to lose my job. And I wanted to try to keep my job and that's why I told them what I told them in the first meeting.

> And DQ was over by the other door where I came in, and they were telling me that that is what I said in front of them and that is what they have to go by, and that I needed to sign this paper. And I felt like if I didn't sign it they weren't going to let me out of the office.

Tijerina also introduced evidence strongly suggesting that WFM discharged her because her injury was "costing too much." For example, Dwight Stewart ("Stewart"), a shift leader at the time of Tijerina's injury, testified that he was present at a meeting with Dixon and Quisenberry, prior to Tijerina's discharge. According to Stewart, Quisenberry made the statement that Tijerina's medical care was costing the store too much money.

Moreover, there was testimony regarding WFM's bonus plan for its management. Quisenberry testified he and Dixon, as assistant store team leader and store team leader, share in the "store team leader bonus,"

which is based on a percentage of the store's net income. Part of the reason WFM management instituted the spending freeze was to increase the profitability of the store. Also, there was testimony admitting that Tijerina's medical expenses were charged against the store. Quisenberry and Dixon would directly benefit from Tijerina's termination in the form of larger bonuses from increased profits.

While economic motive alone may not be sufficient to support a claim for malice, such incentive, however, when combined with the badgering of Tijerina in extracting a confession and then subsequently refusing to listen to her explanation for the confession, constitutes more than a scintilla of evidence of ill-will. The evidence here of ill-will reflects, we believe, an egregious violation of the anti-retaliation statute for which punitive damages are appropriate. The conduct of WFM's managers towards Tijerina differs dramatically from the impersonal act of Mr. Alan Duff in firing Ms. Cazarez for a violation of an employee absence rule. *See Continental Coffee Prods.*, 937 S.W.2d at 454.[11] Indeed, the pattern of behavior by her managers, commencing immediately after her injury and culminating in her termination, constitutes evidence of actual malice. The evidence shows the intent was to terminate Tijerina in an expedited manner utilizing any available pretext. In fact, because Tijerina told her managers on May 18, the day of her termination, that she had not distrib-

uted her pain medication to others, the asserted basis for her termination evaporated, revealing the underlying malice in clear view. Accordingly, after examining the record for evidence supporting the judgment for punitive damages and ignoring all evidence to the contrary, we find there is more than a scintilla of evidence establishing that WFM's termination of Tijerina was based on actual malice.

█ WFM, however, contends Tijerina was required to plead and prove a separate tort for punitive damages, but failed to do so. *See Federal Express Corp. v. Dutschmann*, 846 S.W.2d 282, 284 (Tex.1993). *Dutschmann* involved claims for retaliatory discharge for filing a sexual harassment claim under Tex.Rev.Civ. Stat. Ann. art. 5221k *et seq.* (current version at Tex. Lab.Code Ann. § 21.001 *et seq.* (Vernon 1996)); breach of an employment contract (employee handbook); and breach of a duty of good faith and fair dealing. The jury awarded the plaintiff actual damages for retaliatory discharge and breach of contract, and punitive damages for the breach of the duty of good faith and fair dealing.

WFM's reliance on *Dutschmann* is misplaced. A careful reading of *Dutschmann* reveals the opinion actually stands for the long-standing rule of law in Texas that a cause of action for breach of contract alone will not support an award of punitive dam-

---

11. In *Continental Coffee Products*, Ms. Cazarez, an employee of Continental Coffee Products Company, was terminated for violating the "three-day no call/no show rule." *See* 937 S.W.2d at 447. Mr. Duff, the employee relations manager who fired her, was transferred to Continental from its affiliate, Quaker Oats, while Ms. Cazarez was out on workers' compensation leave for an on-the-job injury. *Id.* at 446. Under the three-day rule, an employee who is not absent on workers' compensation leave loses all seniority and other rights if he or she misses three days of work without properly notifying management. *Id.* The three-day rule applies to employees receiving workers' compensation as soon as they are released to return to work by their treating physician. *Id.* Ms. Cazarez's termination occurred during a telephone conversation with Mr. Duff. *Id.* at 447.

The trial court found that Duff and Continental acted maliciously in firing Cazarez. *Id.* at 454. The intermediate appellate court affirmed, hold-

ing that legally sufficient evidence supported the trial court's finding that Continental violated the anti-retaliation statute with malice. *Id.* at 446. The Supreme Court reversed that part of the court of appeals' judgment affirming the trial court's award of punitive damages. *Id.* at 455. In reaching the conclusion that no evidence supported the trial court's finding that Continental and Duff acted with malice, the Court stated:

We find no evidence of ill-will, spite, or a specific intent to harm Cazarez in this record, however. Duff had never met Cazarez before he fired her for violation of the three-day rule, nor did he even review her file before the firing. None of the evidence establishing the violation, which we have recounted in some detail, suggests that this is the type of egregious violation for which punitive damages are appropriate. Much of that evidence, in fact, was simply not probative to either establish a violation or malice.

*Id.* at 454–455.

ages, but that there must also be a finding of an independent tort. *Id.* (citing *Texas Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex. 1986); *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986); *Bellefonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742, 745 (Tex.1986); *Doubleday & Co. v. Rogers,* 674 S.W.2d 751, 753–54 (Tex.1984)). Indeed, numerous opinions from the Texas Supreme Court and the courts of appeals have cited *Dutschmann* for this statement of the law. *See, e.g., Twin City Fire Ins. Co. v. Davis,* 904 S.W.2d 663, 665 (Tex.1995); *Meek v. Bishop, Peterson & Sharp, P.C.,* 919 S.W.2d 805, 808 (Tex.App.—Houston [14 th Dist.] 1996, writ denied).[12]

However, when alleging a violation of the Texas Anti–Retaliation law, the Texas Supreme Court has held that where actual malice is shown, punitive damages may be assessed against an employer for violating section 451.001. *See Continental Coffee,* 937 S.W.2d at 444. Section 451.002 permits an employee to recover "reasonable damages" incurred as a result of the violation of section 451.001, and that term has been interpreted to include punitive damages. *See Azar Nut Co. v. Caille,* 734 S.W.2d 667, 669 (Tex.1987) (construing predecessor statute to section 451.002). Thus, inasmuch as the statute prohibiting retaliatory discharge contemplates punitive damages, WFM's contention that Tijerina was required to plead and prove a separate tort in order to support her punitive damage award is meritless. WFM's fourth and fifth points of error are overruled.

## VI. Future Medical Expenses

■ In its sixth point of error, WFM contends the trial court erred in entering judgment for future medical costs in the amount of $20,000.00 because there was no evidence to support such verdict. We agree.

■ In order to recover for future medical expenses under Texas law, the plaintiff must show there is a reasonable probability that such medical expenses will be incurred in the future. *See Fisher v. Coastal Transp. Co.,* 149 Tex. 224, 230 S.W.2d 522 (1950); *Fibreboard Corp. v. Pool,* 813 S.W.2d 658, 681 (Tex.App.—Texarkana 1991, writ denied), *cert. denied,* 509 U.S. 923, 113 S.Ct. 3037, 125 L.Ed.2d 724 (1993); *City of Rosenberg v. Renken,* 616 S.W.2d 292, 293 (Tex.Civ. App.—Houston [14 th Dist.] 1981, no writ). The reasonable value of future medical care may be established by evidence of the reasonable value of past medical treatment. *See Harvey v. Culpepper,* 801 S.W.2d 596, 599 (Tex.App.—Corpus Christi 1990, no writ); *Renken,* 616 S.W.2d at 293; *Thate v. Texas & Pac. Ry. Co.,* 595 S.W.2d 591, 601 (Tex.Civ. App.—Dallas 1980, writ dism'd w.o.j.). Also relevant to determining an award for future medical costs are the nature of the injury and the plaintiff's condition at the time of trial. *See Pipgras v. Hart,* 832 S.W.2d 360, 366 (Tex.App.—Fort Worth 1992, writ denied).

■ No precise evidence is required to support an award for future medical costs. *Id.* The preferred practice for establishing future medical costs is through expert medical testimony. *Thate,* 595 S.W.2d at 601. There is no requirement, however, that the plaintiff establish such costs by expert testimony. *See Furr's, Inc. v. Logan,* 893 S.W.2d 187, 194 (Tex.App.—El Paso 1995, no writ); *Gladewater Mun. Hosp. v. Daniel,* 694 S.W.2d 619, 621 (Tex.App.—Texarkana 1985, no writ). It is within the jury's sound discretion to determine what amount, if any, to award in future medical expenses. *See Thate,* 595 S.W.2d at 601. This standard of review, however, is "not so nebulous that a reviewing court will uphold a jury award for

---

12. In any event, the statute under which the plaintiff in *Dutschmann* brought her suit provided for actual damages and equitable relief, but did not provide for punitive damages. Punitive damages could be awarded only if the plaintiff established a separate tort. *See Nagel Mfg. & Supply v. Ulloa,* 812 S.W.2d 78, 80 (Tex.App.—Austin 1991, writ denied) (citing *Nabours v. Longview Sav. & Loan Ass'n,* 700 S.W.2d 901, 903 (Tex.1985)). In 1993, the Legislature amended the statute to provide for punitive damages. Tex.Rev.Civ. Stat Ann. art. 5521k § 7.01 has been recodified in Tex. Lab.Code Ann § 21.2585 (Vernon 1996) (Acts of May 24, 1993, 73 rd Leg. ch. 276, § 7.01(e) effective September 1, 1993) (added by Acts of May 11, 1995, 74 th Leg. ch. 76, § 9.07(d) effective September 1, 1995).

future medical expenses when there is no evidence." *See Harvey,* 801 S.W.2d at 599.

Dr. Newell last saw Tijerina on August 17, 1994. At that time, he recommended she obtain a second opinion regarding the condition of her finger. At his deposition, which was read into the record at trial, Dr. Newell stated if Tijerina were to undergo a second surgery, his fee would be $1,500.00, which would include follow-up visits. Dr. Newell also believed Tijerina would need to continue physical therapy. Evidence at trial established the charge for each physical therapy session was $70.00. Dr. Newell could not express an opinion based on reasonable medical probability, however, as to whether Tijerina would actually require a second operation because he last saw her in August 1994. Moreover, because he had not seen her since August 1994, Dr. Newell could not state, based on a reasonable medical probability, whether Tijerina would suffer future complications as a result of the injury to her finger. Similarly, Dr. Newell, in August 1994, was unable to determine whether Tijerina had suffered any permanent loss of the use of her finger because, at that time, it was too early to make that assessment.

Tijerina testified that since the injury, she takes four or five Advil, or other pain reliever, per day. According to Tijerina, she goes through at least one bottle of Advil every week to week and a half and will probably continue to do so for the remainder of her life at a cost of $6.00 to $8.00 per bottle. WFM did not present any evidence to the contrary.

At trial, the parties stipulated Tijerina's past medical expenses were $6,520.89. Tijerina's evidence at trial supporting her claim for future medical costs included Dr. Newell's speculation, not based on a reasonable medical probability, that Tijerina might need a second surgery for $1,500.00 and her testimony regarding the amount and cost of Advil. Tijerina has not established by expert testimony, or otherwise, with reasonable medical probability that she will incur future medical expenses in the amount of $20,000.00. This court will not uphold an award of future medical costs based on speculation. *See Harvey,* 801 S.W.2d at 599. The trial court, therefore, erred in entering judgment for $20,000.00 and such award should be reduced to an amount covering the Advil.

Tijerina testified that at the time of trial she was forty years old. Based upon the "Life Tables" introduced at trial, Tijerina's life expectancy is forty-one more years. Using an average of the cost per bottle of Advil at $7.00 per every one and one-half weeks for forty-one years, Tijerina's future medical costs supported by the evidence are approximately $9,949.33. Therefore, we sustain WFM's sixth point of error and reduce Tijerina's award for future medical costs to $9,949.33.

Accordingly, the judgment of the trial court is modified, and the judgment as modified is affirmed.