Harry Lloyd SUSSMAN, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Supreme Court of Kentucky.

Dec. 16, 1980.

Rehearing Denied Feb. 17, 1981.

Dale B. Mitchell, Mitchell & Gillum, Somerset, for appellant.

Steven Beshear, Atty. Gen., C. David Clauss, Asst. Atty. Gen., Frankfort, for appellee.

STERNBERG, Justice.

The Grand Jury of Pulaski County, Kentucky, returned an indictment on February 1, 1978, charging appellant with four counts of trafficking in controlled substances. On a jury trial the appellant was found guilty on all counts and his punishment fixed at ten years' imprisonment under Count I, trafficking in morphine; ten years under Count II, trafficking in cocaine; five years under Count III, trafficking in biphetamine 20's; and five years under Count IV, trafficking in quaaludes 300 mg., for a total of 30 years, the maximum punishment allowed by law for these offenses.

Trial testimony established, and the jury was entitled to believe, the following facts:

Tony Edger was a registered pharmacist employed at the Sav–Rite Pharmacy located in Somerset Plaza, Somerset, Kentucky. He was married and his wife was a regular customer at a pet shop called Fish Bowl II, owned and operated by the appellant and located on Highway 27 South, in Pulaski County.

During the first week in July, 1977, Edger was introduced by his wife to appellant and his friend Delbert Ray Hall. The group planned a picnic for the 4th of July to be held at the Pulaski County Park. The men and their wives attended. Edger got drunk. While the three men were together, the appellant, who knew that Edger had access to drugs as a pharmacist, asked him if he could get him anything in the drug line. Edger resisted, but then agreed to satisfy the appellant's request for biphetamine 20's or "blacks" when appellant gave him a $100 bill. Within 48 hours Edger took 100 such pills from Sav–Rite's stock and delivered them to appellant. Edger then began to order 100 or 200 pills from the manufacturer every four or five days for delivery to appellant. A total of between 1000 and 1200 "blacks" were transferred at $1.00 each on or before September 30, 1977.

Sometime during the third week of July, 1977, appellant persuaded Edger to sell him some quaaludes, a drug in pill form. These sales soon matched the sale of biphetamines in frequency and amounts. Appellant bought approximately 1800 pills of quaalude at a cost of between $1000 and $1500 on or before September 30, 1977. With the exception of the first $100 given Edger in advance, the appellant always paid him for the biphetamines and quaaludes one or two days after receiving them. At about the same time the appellant persuaded Edger to sell him the quaalude, he also persuaded

Edger to sell him some cocaine. Edger transferred one ounce of cocaine to appellant for the sum of $1500. Its street value was $42,000. Near the end of July or the first of August, 1977, appellant induced Edger to sell him 20 cc's of morphine, an injectionable drug.

Edger attempted to camouflage his drug dealings at the pharmacy by forging prescriptions kept there which had been previously signed by a medical doctor but otherwise blank. These blank prescriptions existed as a convenience to the doctor, the drug store, and the patients who were receiving maintenance drugs. Edger also altered the quantities specified on some legitimate prescriptions so as to increase the store's inventory of Schedule II drugs he was stealing for sale to illicit purchasers. He knew that the store was required by law to maintain a record of all purchases of narcotics bought from drug representatives and sold to customers through prescriptions it filled. He also knew that the stock of Schedule II drugs was subject to investigative audit at all times by the enforcement arm of the Kentucky Board of Pharmacy.

It was just such an audit conducted by agent Michael Lewis which led to Edger's arrest and the appellant's indictment. Agent Lewis' suspicions were aroused when he discovered the forged and altered prescription forms, some of which were for drug dosages that if consumed would have been fatal to the "patient." Feeling pressure from Mr. Lewis' investigation, Edger asked appellant to return such of the cocaine and morphine in his possession so that these items could be returned to the drug store's inventory. After some delay, the plan was accomplished as to the cocaine held by appellant. As to the morphine, appellant told Edger that he had taken it and everything else to his girlfriend's apartment. His girlfriend was Mary Singer, and her apartment was located at 808 Somerset Village, Somerset, Kentucky.

On one occasion when Edger met appellant and sold and delivered biphetamine 20's to him, appellant invited Edger to accompany him, which Edger did. The two men traveled to Lake View Motel on Highway 27 South, where appellant went in with the drugs while Edger stayed in the car. After a short period of time appellant returned to the car and gave Edger the money owed to him.

Delbert Ray Hall, appellant's friend, observed appellant selling drugs on at least three or more occasions. The first sale that Hall witnessed was to a man named Roy while the men were at Hall's living quarters located in the Cumberland Motel. The sale was for biphetamine 20's for $150. Within the next few weeks Hall saw appellant at his home sell Roy some more narcotics. The third sale was of quaaludes and biphetamines. In August, 1977, the appellant approached Hall and showed him a bottle of liquid labeled cocaine "hydro something" that was hidden in appellant's automobile. Appellant had gotten the cocaine from Edger and was trying to find a buyer. Two possible buyers, Roy and a Louisville resident, were suggested, without a sale having been made however. Whereupon, the cocaine was returned to Edger.

Mary Singer, appellant's girlfriend, had given appellant a key to her apartment for use only when she was present inside the apartment. She had no knowledge of any drugs being in her apartment until the police, executing a search, found cocaine in her bedroom. Appellant, in the presence of Mr. Neikirk, the county attorney, Sheriff John Adams, a police officer, and Mr. Michael Lewis, stated that he knew what had been found and where it had been found and he also said that Singer knew nothing about the narcotics being stored in her apartment.

Shortly after Edger's arrest on October 3, 1977, he advised the county attorney and the police of his illegal activities and supplied details of the roles of other persons, including the appellant. Searches for illicit drugs were conducted at Fish Bowl II, appellant's home, and Ms. Singer's apartment. Appellant was taken by Sheriff Adams to Singer's apartment where the search by other officers was in progress. Appellant had been advised of his constitutional rights

while sitting in the car in the parking lot of Singer's apartment, and upon reaching the apartment his rights were read to him. Appellant's concern was not with having his rights explained to him; his concern was that Ms. Singer was innocent and that the drugs found in her apartment were there without her knowledge. He begged the police to charge him and not her since she was innocent of any wrongdoing.

This is a direct appeal from the Pulaski Circuit Court and appellant urges five errors, any one of which is alleged to be sufficient to justify a reversal of the judgment of the trial court. First of all, the appellant charges:

> I. The Court improperly denied standing to object to the search of the apartment of Mary Singer, thereby allowing the introduction of evidence obtained under an inadequate search warrant and affidavit.

Mary Singer and her three minor children lived in Apartment 808 at the Somerset Village Apartments, Somerset, Kentucky. She and appellant were courting and he would visit with her several times each week, but never to stay overnight. Singer furnished appellant a key to her apartment; however, he was never to use the key at any time when Singer was not at home. In other words, the appellant was authorized to use the key only when Singer was at home and on no other occasion. Appellant did not maintain any property in the apartment, except possibly a bottle of after-shave lotion or a coat.

On October 3, 1977, pursuant to a search warrant, the Singer apartment was searched and a vial of morphine was found in the bedroom. While the apartment was being searched, appellant was being held in the custody of Sheriff Adams in the parking lot of the apartment building. When appellant learned that the search was going on, he stated that the morphine was his not Singer's; that she knew nothing about the morphine being hid in the apartment; and that he could tell the people where it was and what it was. Further, while sitting in the car, appellant was advised of his constitutional rights, and when taken to the apartment he was again so advised. Appellant vehemently and courageously claimed ownership of the morphine, and again stated that Singer had nothing to do with it and, as a matter of fact, did not know that it was in her apartment.

Appellant objected to the use of the fruits of the search against him on his trial. The trial court found that appellant had no standing to attack the search and seizure. We concur.

KRS 218A.140(1) provides that, "No person shall traffic in any controlled substance except as authorized in this chapter." Possession is included in the definition of trafficking. KRS 218A.010(19) states, " 'Traffic' means to manufacture, sell, transfer or possess with intent to sell a controlled substance."

The appellant argues that since he is charged with possession, an integral part of trafficking in controlled substances, he is a person aggrieved by an unlawful search and seizure and has an automatic standing to challenge the search. In *Rawlings v. Kentucky*, —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the Supreme Court of the United States entered into a detailed discussion of the right to challenge issue. Rawlings was convicted of trafficking in and possession of controlled substances. Throughout his trial objection was made to the admissibility of evidence and statements on the ground that they were the fruits of an illegal detention and an illegal search, the same as presented in the subject action. In *Rawlings* the trial court, the Court of Appeals of Kentucky, and this court denied the right to challenge. The Supreme Court of the United States affirmed.

The appellant contends that he had sufficient property interest and a reasonable expectation of privacy in the premises where the search was made so as to authorize the challenge. Appellant bears the burden of showing that he had a legitimate expectation of privacy in the apart-

ment. *Rawlings*, supra, at page 2561. Singer furnished appellant a door key to her apartment for his use only .when she was at home and for no other time. Appellant did not show any right of control over the apartment or whether he at any time attempted to control the use of the apartment or limit Singer's use of the premises. It is true that appellant, a married man, was afforded this cloister for privacy; more than likely privacy from his wife in the event she went looking for him. This is hardly the type of privacy referred to in *Rawlings*.

Appellant also contends that because he claimed ownership of the narcotics he was entitled to challenge the search irrespective of lack of expectation of privacy. In *Rawlings* we disposed of a similar issue with this statement:

"Petitioner contends nevertheless that, because he claimed ownership of the drugs in Cox's purse, he should be entitled to challenge the search regardless of his expectation of privacy. We disagree. While petitioner's ownership of the drugs is undoubtedly one fact to be considered in this case, *Rakas* emphatically rejected the notion that 'arcane' concepts of property law ought to control the ability to claim the protections of the Fourth Amendment. See [*Rakas v. Illinois*], 439 U.S., at 149–150, n.17, 99 S.Ct., at 434, n.17. See also *United States v. Salvucci*, —— U.S. [——], ante at ——, ——, 100 S.Ct. [2547], at 2552–2553. Had petitioner placed his drugs in plain view, he would still have owned them, but he could not claim any legitimate expectation of privacy. Prior to *Rakas*, petitioner might have been given 'standing' in such a case to challenge a 'search' that netted those drugs but probably would have lost his claim on the merits. After *Rakas*, the two inquiries merge into one: whether governmental officials violated any legitimate expectation of privacy held by petitioner.

"In sum, we find no reason to overturn the lower court's conclusion that petitioner had no legitimate expectation of priva-

cy in Cox's purse at the time of the search."

We have no hesitation in concluding that appellant had no standing to object to the search.

II. It was reversible error to overrule defendant's motion for continuance where the Commonwealth introduced testimony different from the answers supplied in response to defendant's Bill of Particulars.

Throughout the course of the trial appellant objected, and at this time still objects, to the introduction of testimony which he charges is different from that furnished to him in answer to his request for a bill of particulars filed on April 10, 1978. More specifically, the appellant is chagrined because he is charged with having committed the offense at various and sundry times, dates, and locations rather than at specific times, dates, and locations. Also, the appellant complains that the information was not received by him until a few days prior to trial and that without this information he was unable to prepare adequately for the trial. Furthermore, the record reflects that on April 10, 1978, appellant filed a motion for a bill of particulars, accompanied by 11 inquiries. The record does not reflect that responses were ever filed to the inquiries. The trial commenced on September 11, 1979, a year and five months after the motion was filed. It appears that no action was taken by the appellant to coerce counsel for the Commonwealth to respond to the inquiries. Responses by way of a bill of particulars can and will be required by the court (RCr 6.22) if the details of the crime are needed in order to prepare a defense. *Finch v. Commonwealth*, Ky., 419 S.W.2d 146 (1967). Oral responses to appellant's inquiries were made by the attorney for the Commonwealth on Friday prior to the trial starting on the following Monday, September 11, 1979. For lack of time to adequately prepare under these circumstances, the appellant argues that his trial should have been continued. RCr 9.04 provides:

"Postponement of Hearing or Trial; Motion and Affidavit.

The court, upon motion and sufficient cause shown by either party, may grant a postponement of the hearing or trial. A motion by the defendant for a postponement on account of the absence of evidence may be made only upon affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to obtain it. If the motion is based on the absence of a witness, the affidavit must show what facts the affiant believes the witness will prove, and not merely the effect of such facts in evidence, and that the affiant believes them to be true. If the attorney for the commonwealth consents to the reading of the affidavit on the hearing or trial as the deposition of the absent witness, the hearing or trial shall not be postponed on account of his absence."

Counsel for appellant did not pursue the provisions of RCr 9.04, and this court will not presume that the trial judge would not have exercised sound discretion in granting or refusing to grant a continuance.

III. Since no reasonable doubt existed as to whether Hall was an accomplice, the Court erred in submitting the question to the jury; and without other evidence tending to connect the defendant Sussman to the crime, Sussman was entitled to a directed verdict as a matter of law.

The appellant complains that the trial court left it to the discretion of the jury to determine whether the witness Delbert Ray Hall was an accomplice. The rule pertaining to whether Hall was an accomplice is that if there is reasonable doubt as to whether he had the intent to promote or facilitate the commission of the offense, the question of being an accomplice must be left to the jury as a question of fact. The significance of the status of being an accomplice is manifest by RCr 9.62, which provides:

"Testimony of Accomplice.

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed, and the circumstances thereof. In the absence of corroboration as required by law, the court shall instruct the jury to render a verdict of acquittal."

More caution is thus required when weighing the testimony of an accomplice than weighing the testimony of a witness who is not an accomplice. Thus, if Hall was an accomplice his testimony standing alone and unsupported by corroborative evidence could not sustain the conviction. On the other hand, the testimony of Hall, his not being an accomplice, could support the conviction. The status of Hall, whether or not an accomplice, in view of the nature of the culpability of the evidence, is of no concern because the evidence, other than that of Hall, was of such force and the corroborating evidence was of such quality that it would support appellant's conviction.

IV. The reasonable doubt instruction which called for reasonable doubt upon the whole case rather than reasonable doubt on each element of each count, as requested by defendant, was error.

The reasonable doubt instruction given in this case was taken, word for word, from Palmore's Kentucky Instructions to Juries, Vol. 1, Section 11.02. Appellant attempts to differentiate between the need for an instruction on reasonable doubt of appellant's guilt to the case as a whole and reasonable doubt of appellant's guilt on each element of each count in the indictment. Instruction No. 1 dealt with "trafficking in controlled substance." It advised the jury that it could only find the appellant guilty (1) if it believed beyond a reasonable doubt that the offense was committed in Pulaski County, Kentucky; (2) if it believed beyond a reasonable doubt that the offense occurred between the dates of July 4, 1977, and September 30, 1977; (3) if it

believed beyond a reasonable doubt that he possessed with intent to sell a quantity of morphine; and (4) if it believed beyond a reasonable doubt that he knew the substance so possessed by him was morphine. The court further gave the whole-case instruction, which was merely the icing on the cake as far as emphasizing to the jury that its belief of guilt must be beyond a reasonable doubt.

We find no fault with the instructions given by the trial court.

V. The overall number of errors, though not conceded to be harmless singularly, can never be harmless when they exist in the numbers present herein, and their cumulative effect was to deny the defendant a fair trial, notwithstanding their singular effect, if harmless.

 This court has carefully reviewed and considered each alleged error brought to it on this appeal. We do not find this allegation of error to be meritorious. The appellant received a fair trial; what more can he ask or expect?

The judgment is affirmed.

All concur.