TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00626-CV






Safeshred, Inc., Appellant


v.


Louis Martinez, III, Appellee






FROM COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY

NO. C-1-CV-07-013578, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING





O P I N I O N


 Safeshred, Inc. fired Louis Martinez after he refused to drive a commercial vehicle
he found to be unsafe and noncompliant with federal and state regulations. Martinez sued Safeshred,
alleging he had been terminated for refusing to commit an illegal act. See Sabine Pilot Service,
Inc. v. Hauck, 687 S.W.2d 733, 735 (Tex. 1985) (recognizing exception to at-will-employment
doctrine when employee is fired for refusal to commit illegal act). After a jury trial, the trial court
entered judgment awarding Martinez $7,569.18 in economic damages for lost wages and benefits,
$10,000 in compensatory damages for non-economic losses, including mental anguish, and $200,000
in exemplary damages. Safeshred appeals, arguing in five issues on appeal that (1) exemplary
damages are not available in a Sabine Pilot cause of action absent the showing of an independent
tort; (2) the evidence is legally and factually insufficient to prove malice, a predicate finding to an
award of exemplary damages; (3) the amount of exemplary damages awarded is so excessive as to
violate the United States Constitution and Texas law; (4) compensatory damages for mental anguish
and related emotional losses are not available in a Sabine Pilot cause of action absent the showing
of an independent tort; and (5) the evidence is legally and factually insufficient to support the award
of compensatory damages. We affirm the awards of economic and exemplary damages and reverse
the award of compensatory damages for non-economic losses. (1)


BACKGROUND

 Martinez began work delivering documents for Safeshred's sister company, Safesite,
on September 25, 2007. (2) After only three days of work, Martinez was promoted to a position driving
commercial vehicles for Safeshred. (3) At Safeshred, Martinez's responsibilities included driving an
eighteen-wheeler with a 53-foot van from Safeshred's location in Austin to company facilities in
Dallas, Houston, and San Antonio. Martinez would pick up documents that those facilities had
collected and bring them to Austin for shredding. 

 On Monday, October 1, 2007, his first day with Safeshred, Martinez performed a pre-trip inspection on the vehicle he was to drive, as he was required to do as a licensed commercial
driver. His inspection revealed several violations of federal and state regulations. Specifically,
Martinez found that the cab lacked both a Texas Department of Transportation (TxDOT)
identification number on the side of the door and required markings identifying the vehicle as
commercial. In addition, the dealer's tag on the vehicle had been expired for one year.

 Martinez testified that he told Donald Wallace, the president of Safeshred, about these
failures in compliance, specifically indicating that it would be illegal to drive the truck in its
condition. (4) According to Martinez, Wallace said that he would look into the violations, but told
Martinez to drive the vehicle anyway. Martinez proceeded to drive the vehicle for the remainder of
his first week at Safeshred. He testified that he decided to drive the vehicle based on his conclusion
that the violations did not present any safety issues and his desire to keep his job. No action was
taken to remedy the violations. 

 On Friday of Martinez's first week with Safeshred, he was informed that he would
be hauling a load of industrial shelving to Shertz, Texas, the following Monday. The load would
consist of eight-foot-long steel rails and twenty-foot-long steel uprights stacked on a flatbed trailer. 
Over the weekend, Martinez reviewed the rules and regulations regarding securing loads on
flatbed trailers. (5)

 On Monday, October 8th, Martinez performed a pre-trip inspection of the cab and
flatbed trailer he was to drive. Martinez found the same violations he had previously noted on the
cab, including the missing TxDOT identification number, missing commercial markings, and the
expired dealer's tag. In addition, Martinez found violations in the condition of the flatbed trailer. 
The trailer was missing a reflector lens on one of its lights and a lug nut on one of its wheel wells. 
In addition, there was no dunnage between the rows of steel stacked on the flatbed trailer. (6) Finally,
Martinez discovered cuts in two of the nylon straps used to secure the load of steel. The four-inch-wide strap used to secure the load had a one-inch cut in it, while the three-inch-wide strap used to
the secure the load had a three-quarter-inch cut in it. (7)

 Martinez testified that he told one of his supervisors--either Linden Kroll, the
delivery manager at Safesite, or Kirk Tooley, the operations manager at Safesite--that the load was
unsafe and illegal to haul. He specified each of the violations he had discovered in the cab and the
flatbed trailer. Martinez was nonetheless instructed to drive the load to Shertz.

 On his way to Shertz, Martinez was pulled over by a Texas Department of Public
Safety (DPS) officer to inspect the weight of the load. (8) In the course of weighing the vehicle, the
officer discovered several of the violations that Martinez had pointed out. (9) Noting the federal or
state regulation violated in each instance, the officer prepared a citation for the missing TxDOT
identification number, missing commercial markings, and expired dealer's tag on the cab. The
citation also listed the missing lug nut and reflector lens on the trailer. Finally, the citation noted the
improper tiedown devices used in violation of section 393.106(b) of the Federal Motor Carrier Safety
Regulations, which states that "[c]argo must be firmly immobilized or secured on or within a vehicle
by structures of adequate strength, dunnage or dunnage bags, shoring bars, tiedowns or a
combination of these." 49 C.F.R. § 393.106(b) (2006). (10) Specifically, the officer pointed out to
Martinez that the nylon straps used to secure the load had cuts in them in violation of
federal regulations.

 After the officer prepared the citation and orally explained each violation to Martinez,
he told Martinez that he could finish delivering his load, but also ordered the vehicle not to be used
again until the violations were remedied. Accordingly, after finishing his delivery and returning the
vehicle to Safesite, Martinez informed Wallace, Tooley, and Kroll of the violations. He showed the
citation to each of them, and Tooley made a copy of it. Martinez told Tooley that the officer had
instructed him not to move the cab and trailer until the violations had been remedied.

 The next day, October 9th, Tooley asked Martinez to drive the cab to Abilene to pick
up a belly-dump trailer. (11) None of the violations pertaining to the cab had been remedied. Martinez
refused to drive the cab, telling Tooley that he could not drive the cab until it was brought up to code. 
Martinez testified that Tooley "repeatedly" tried to convince him to drive the cab and that he feared
that Tooley would fire him. Instead, due to his refusal to drive the noncompliant vehicle, Martinez
was assigned document-delivery tasks for Safesite for the remainder of the week.

 On the following Monday, October 15th, Martinez was given a second load of steel
shelving to haul to Shertz. During his pre-trip inspection, Martinez noted that the cab had been
brought into compliance with federal and state regulations. Martinez, however, found violations
concerning the way in which the load had been secured on the flatbed trailer. Specifically, the load
lacked dunnage between the rows of steel, and the same three-inch-wide strap that had a
three-quarter-inch cut in it was still being used to secure the stacks of steel. 

 Martinez informed Kroll of the violations, but Kroll instructed him to drive the load
to Shertz. Martinez then informed Tooley, who also instructed him to take the load as it was. 
During the trip, Martinez testified that the load was shifting as he drove, causing the trailer to sway
left and right and affecting the handling of the vehicle. Martinez testified that he was worried about
the safety of himself and others due to the instability of the load of steel.

 Two days later, on October 17th, Safeshred again asked Martinez to haul a load of
steel shelving. During his pre-trip inspection, Martinez noted that the same damaged three-inch-wide strap was still being used to secure the steel and that there was again no dunnage between the
stacks of steel. The steel stacks were also higher than they had been in previous loads, rising above
the roof of the cab, and had already begun to shift before Martinez started driving the vehicle. In
addition, the steel was hanging off of the back of the trailer by roughly three feet. (12) 

 Martinez told Kroll and Tooley that the load was illegal and unsafe to drive, as the
damaged three-inch-long strap was still being used, the load was stacked too high, the load was not
properly secured due to lack of dunnage, and the load was hanging too far off of the back of the
trailer. (13) Martinez was instructed to drive the load. 

 From the start of the trip, Martinez found it difficult to steer and maneuver the cab. 
Martinez could see the load shifting as he drove and could hear the load creaking. After driving the
load for five miles, Martinez turned around and then returned the load to Safesite. Upon parking the
vehicle, Martinez confirmed that the load had shifted during his short trip. 

 Martinez reiterated to Kroll and Tooley that the load was illegally secured and unsafe
to drive. Tooley called Wallace, who was in a restaurant in Colorado at the time, and told him that
Martinez was refusing to drive the vehicle. Wallace asked Tooley to contact TxDOT regarding the
overhang off of the back of the trailer. Wallace also asked his father, Dalton Wallace, (14) to inspect
the load. 

 Between 30 and 90 minutes later, Tooley called Wallace back to inform him that the
overhang in the back did not violate TxDOT rules. He also told Wallace that he, Kroll, and Dalton
Wallace had all found the load to be safe. (15) Tooley testified that he recommended to Wallace that
Martinez be fired due to his refusal to take the load. 

 Wallace asked to speak to Martinez. Martinez testified that he told Wallace about
the illegal strap, the lack of dunnage, and the overhang in the back. (16) Wallace told Martinez that he
had been hired to drive the truck to Shertz, and said, "[Y]ou can either get in my truck and leave, or
you can get in your truck and leave." Martinez handed the phone back to Tooley, saying that
Wallace had fired him. (17)

 After Wallace fired Martinez, Tooley filled out a company form recording Martinez's
termination. In the explanatory area, Tooley wrote, "Louis abandoned his job after he refused to
perform his job." Tooley also testified at trial that he believed that Wallace had not fired Martinez,
but instead that Martinez had voluntarily abandoned his job. On the form, Tooley marked "no" to
the question of whether Martinez was eligible for rehire.

 After Martinez's termination, the load sat untouched on Safesite property until
October 22, 2007, when a temporary worker was hired to drive the load. On the way to Shertz, the
load of steel broke loose and crashed through the back window of the cab. Though neither the driver
nor other motorists were hurt, the accident caused $1,800 worth of damage to the cab.

 Martinez brought suit for termination for failure to commit an illegal act. See Sabine
Pilot, 687 S.W.2d at 735. At trial, Martinez testified that actions of his supervisors at Safeshred had
subjected him to a great deal of stress and caused him to lose "a lot" of sleep. At the conclusion of
the jury trial, the trial court entered judgment awarding Martinez $7,569.18 in economic damages
for lost wages and employee benefits, $10,000 in compensatory damages for non-economic losses,
including mental anguish, and $200,000 in exemplary damages. This appeal followed.


STANDARD OF REVIEW

 Appellate courts review legal determinations de novo. Reliance Nat'l Indem. Co.
v. Advance'd Temps., Inc., 227 S.W.3d 46, 50 (Tex. 2007). A jury's factual determinations, on the
other hand, receive more deferential review based on the sufficiency of the evidence. Id. When reviewing a jury finding for legal sufficiency, we must credit evidence
favorable to the judgment if a reasonable fact-finder could, disregard contrary evidence unless a
reasonable fact-finder could not, and reverse the fact-finder's determination only if the evidence
presented in the trial court would not enable a reasonable and fair-minded fact-finder to reach the
judgment under review. City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). We will sustain
the appellants' legal-sufficiency challenges if the record reveals: (1) the complete absence of
evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight
to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact
is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of a
vital fact. See id. at 810. More than a scintilla of evidence exists if the evidence rises to a level that
would enable reasonable and fair-minded people to differ in their conclusions. Ford Motor Co.
v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004).

 When reviewing a jury finding for factual sufficiency, we consider all the evidence
and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that
it is clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). Under either
standard of review, we must be mindful that the jury as finder of fact is the sole judge of the
credibility of the witnesses and the weight to be given their testimony. McGalliard v. Kuhlmann,
722 S.W.2d 694, 696 (Tex. 1986); Raymond v. Rahme, 78 S.W.3d 552, 556 (Tex. App.--Austin
2002, no pet.). The jury may choose to believe one witness and disbelieve another, and we must not
impose our own opinion to the contrary. City of Keller, 168 S.W.3d at 819. (18)

 We review the amount of exemplary damages awarded by a jury de novo to ensure
that the award is not grossly disproportional to the gravity of the defendant's conduct. Bunton
v. Bentley, 153 S.W.3d 50, 54 (Tex. 2004).


DISCUSSION

Availability of Punitive Damages

 In its first issue on appeal, Safeshred argues that a Sabine Pilot cause of action does
not support an award of exemplary or punitive damages without evidence of an independent tort. 
This is an issue of first impression in this Court.

 The Sabine Pilot cause of action is an exception to the at-will-employment doctrine
adopted in Texas courts. Under the traditional at-will-employment doctrine in Texas, employment
for an indefinite term may be ended at will and without cause. Sabine Pilot, 687 S.W.2d at 734-35;
see also East Line & R.R.R. Co. v. Scott, 72 Tex. 70, 10 S.W. 99, 102 (1888). The Sabine Pilot
exception, however, "afford[s] employees protection from retaliatory discharge for refusing to
engage in illegal conduct." Winters v. Houston Chronicle Pub. Co., 795 S.W.2d 723, 725 (Tex.
1990) (Doggett, J., concurring). Under the exception, an employee can recover by showing "by a
preponderance of the evidence that his discharge was for no other reason than his refusal to perform
an illegal act." Sabine Pilot, 687 S.W.2d at 735. 

 The supreme court did not reach the issue of available damages in its Sabine Pilot
decision, and there are no other common-law exceptions for retaliatory discharge in Texas to provide
guidance. (19) However, Justice Kilgarlin stated in his concurring opinion in Sabine Pilot that
recoverable "damages would include loss of wages . . . and employee retirement benefits," and
"would also include punitive damages." Id. at 736 (Kilgarlin, J., concurring). Justice Kilgarlin
based his conclusions on a comparison of the Sabine Pilot cause of action to the Texas Anti-Retaliation statute. (20) Id.

 We agree that the Texas Anti-Retaliation statute, which bars employers from firing
employees in retaliation for submitting a worker's compensation claim, provides a useful point of
reference. See Tex. Lab. Code Ann. § 451.001 (West 2006). Both the Sabine Pilot cause of action
and the Anti-Retaliation statute carve out exceptions to the at-will-employment doctrine in cases of
retaliatory discharge. See Texas Dep't of Human Servs. v. Hinds, 904 S.W.2d 629, 634 (Tex. 1995)
(characterizing Sabine Pilot claim as "a cause of action for retaliatory discharge"). While the Anti-Retaliation statute is a legislative creation, the statute does not specify the damages available to
successful claimants, leaving it to the courts to determine whether punitive damages may be
awarded. See Azar Nut Co. v. Caille, 734 S.W.2d 667, 669 (Tex. 1987) (noting that Anti-Retaliation
statute provides only for recovery of "reasonable damages suffered by employee as a result of the
violation"). Accordingly, cases interpreting the Anti-Retaliation statute would "[l]ogically . . . serve
as a guide" to the damages available under Sabine Pilot. 687 S.W.2d at 736 (Kilgarlin, J.,
concurring). 

 We turn, then, to supreme court decisions determining whether punitive damages may
be awarded for violations of the Anti-Retaliation statute. At the time Sabine Pilot was decided, the
supreme court had previously held that punitive damages were available under the Anti-Retaliation
statute. See id. (citing Carnation Co. v. Borner, 610 S.W.2d 610 (Tex. 1980)). In subsequent
decisions, the supreme court has maintained that position, explaining that punitive damages are
"proper and necessary" to prevent employers from engaging in retaliatory discharge. Azar Nut,
734 S.W.2d at 669 (citation and quotation omitted). Noting that the purpose of the Anti-Retaliation
statute is to deter employers from firing employees for engaging in a protected activity, the court has
stated that "the threat of punitive damages is inherently more likely to restrain bad faith employers
from wrongfully terminating employees." Id. Further, the court has recognized that, "[i]n the
absence of the deterrent effect of punitive damages, there would be little to dissuade an employer
from engaging in the practice." Id. (quoting Webb v. Dayton Tire & Rubber Co., 697 P.2d 519, 523
(Okla. 1985)).

 This same logic applies to the Sabine Pilot cause of action. The threat of punitive
damages is vital to achieving the purpose of the supreme court's Sabine Pilot exception, which is
to "deter the violation of criminal laws" by prohibiting employers from firing employees for refusal
to commit illegal acts. See Ran Ken, Inc. v. Schlapper, 963 S.W.2d 102, 106 (Tex. App.--Austin
1998, pet. denied). The need to deter this conduct is brought into sharp focus in a case such as this,
where the actions of the employer not only violated the law but placed the safety of the employee
and the public at risk. We consequently conclude that, as in cases brought under the Anti-Retaliation
statute, the availability of punitive damages is "proper and necessary" in a Sabine Pilot cause of
action. See Azar Nut, 734 S.W.2d at 669 (citation and quotation omitted). 

 Safeshred, however, argues that punitive damages are not available in this case
because a Sabine Pilot cause of action sounds in contract, not tort, and punitive damages may not
be recovered for breach of contract absent an independent tort. See Lisanti v. Dixon, 147 S.W.3d
638, 645 (Tex. App.--Dallas 2004, pet. denied) (citing Amoco Prod. Co. v. Alexander, 622 S.W.2d
563, 571 (Tex. 1981)). (21) However, "[r]etaliatory discharge has long been recognized as an action
sounding in tort." Upton County v. Brown, 960 S.W.2d 808, 816 (Tex. App.--El Paso 1997, no pet.)
(analyzing Texas Whistleblower Act); see also Almazan v. United Servs. Auto Ass'n, 840 S.W.2d
776, 780 (Tex. App.--San Antonio 1992, writ denied) (explaining that for statute-of-limitations
purposes claim under Anti-Retaliation statute "generally sounds in tort"); Russell v. Edgewood
Indep. Sch. Dist., 406 S.W.2d 249, 251 (Tex. Civ. App.--San Antonio 1966, writ ref'd n.r.e.)
(indicating that action for termination because of union membership was action sounding in tort).

 Further, we would expect attorney's fees to be available in a Sabine Pilot cause of
action if such claims sounded in contract. See Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West
2008) (allowing recovery of attorney's fees when claim involves "an oral or written contract"). The
only court to address the issue, however, has determined that attorney's fees are not available in
Sabine Pilot cases. In Garcia v. Sunbelt Rentals, Inc., the Fifth Circuit held that the prevailing party
in a Sabine Pilot cause of action could not recover attorney's fees under the civil practice and
remedies code. 310 F.3d 403, 404-05 (5th Cir. 2002). The court recognized that "no Texas court has
held that an at-will employment relationship constitutes an oral contract warranting recoupment of
fees." Id. at 404. Accordingly, the court's holding that attorney's fees cannot be recovered for a
Sabine Pilot cause of action further indicates that the cause of action sounds in tort, and consequently
supports an award of punitive damages. (22)

 As we conclude that an award of punitive damages is "proper and necessary" in a
Sabine Pilot cause of action, Safeshred's first issue on appeal is overruled.


Malice

 Safeshred next challenges the legal and factual sufficiency of the evidence supporting
the jury's finding of malice. (23) In this case, the jury was instructed that it must find clear and
convincing evidence of malice before awarding exemplary damages. The charge provided the
following definition of malice:


"Malice" means:


(a) a specific intent by Donald Wallace or Kirk Tooley to cause substantial injury
to Louis Martinez, III; or, 


(b) an act or omission by Donald Wallace or Kirk Tooley,


 (i) which when viewed objectively from the standpoint of Donald
Wallace or Kirk Tooley at the time of its occurrence involves
an extreme degree of risk, considering the probability and
magnitude of the potential harm to others; and


 (ii) of which Donald Wallace or Kirk Tooley has actual, subjective
awareness of the risk involved, but nevertheless proceeds with
conscious indifference to the rights, safety, or welfare of
others.



 In conducting an evidentiary-sufficiency review under a clear-and-convincing
standard of proof, we examine whether the jury could reasonably form a firm belief or conviction
that its finding was true. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). Under the legal-sufficiency
inquiry, we look at all the evidence in the light most favorable to the finding and assume that the
fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. Id. 
Under the factual-sufficiency inquiry, we look at the evidence in light of the entire record. Id. Either
direct or circumstantial evidence may be used to meet this evidentiary burden. USA Truck, Inc. v.
West, 189 S.W.3d 904, 908 (Tex. App.--Texarkana 2006, pet. denied) (citing Transportation Ins.
Co. v. Moriel, 879 S.W.2d 10, 23 (Tex. 1994)). 

 We note at the outset that Safeshred does not contest the jury's finding that Martinez
was fired for the sole reason of his refusal to commit an illegal act. Such evidence alone, however,
is not enough to show malice; otherwise, malice under this standard would be present in every case
of wrongful discharge. Ancira Enters., Inc. v. Fischer, 178 S.W.3d 82, 94 (Tex. App.--Austin 2005,
no pet.) (citing Continental Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 454 (Tex. 1996)). Under
the charge given to the jury, Martinez must also show that Wallace and Tooley acted either (a) with
the specific intent to cause him harm or (b) with conscious indifference regarding the violation of
his legal rights. Id. (examining charge with identical wording).

 We begin with an examination of conscious indifference under definition (b). In this
case, Martinez testified that Wallace and Tooley asked him numerous times to drive vehicles or
loads that they knew or had reason to know were unsafe or illegal. (24) Specifically, Martinez testified
that the load he was supposed to drive on the day he was fired was secured with a faulty three-inch
strap, a defect that had been pointed out in the DPS citation that Martinez had received on a prior
trip and had shown to both Wallace and Tooley. Martinez testified that, on the day he was fired, he
complained to Wallace and Tooley about safety issues involving the load, specifically mentioning
the three-inch strap among other violations. Wallace and Tooley insisted that he drive the vehicle
anyway, and Wallace fired him when he did not. The evidence at trial also showed that Tooley noted
on Martinez's termination form that Martinez had "abandoned his job." Martinez testified, however,
that he told Tooley that Wallace had fired him, and Tooley admitted in his own testimony that he had
advised Wallace to fire Martinez immediately before Martinez was terminated.

 This evidence would enable a reasonable juror to form a firm belief that Safeshred
acted with conscious indifference to Martinez's legal rights when terminating his employment. 
Turning to the language of the charge, we conclude that the evidence would enable a reasonable juror
to form a firm belief that Wallace and Tooley's firing of Martinez for failure to commit an illegal
act objectively constituted an extreme risk to Martinez's legal rights. Further, the evidence would
enable a reasonable juror to form a firm belief that Wallace and Tooley proceeded with conscious
indifference to the risk to Martinez's legal rights. Martinez's testimony indicates that Wallace and
Tooley each knew that the load Martinez was being asked to drive was illegal, and that they fired
him despite possessing that knowledge. This evidence permits the inference that, in knowingly
forcing Martinez "to choose between risking criminal liability or being discharged from his
livelihood," Winters, 795 S.W.2d at 724, Wallace and Tooley acted with conscious indifference to
the violation of Martinez's legal rights. Ancira, 178 S.W.3d at 94. Further, the jury could resolve
the evidence to conclude that Tooley misrepresented the reason for Martinez's termination when
indicating that Martinez had abandoned his job, a fact that further supports a finding of malice. See
Bennett v. Reynolds, 242 S.W.3d 866, 895 (Tex. App.--Austin 2007, pet. granted) (noting that
falsity and fabrication concerning relevant events may evince malice). 

 Accordingly, under definition (b) submitted to the jury, the evidence is legally
sufficient for a juror to form a firm belief that Wallace and Tooley had objective and subjective
knowledge that their actions involved an extreme degree of risk of violating Martinez's legal rights,
yet proceeded with conscious indifference to that risk. Further, as the only competing evidence in
the record derives from Wallace and Tooley's testimony--which the jury was entrusted with
weighing--the evidence in light of the entire record is such that a fact-finder could reasonably form
a firm belief or conviction that its finding was true, satisfying the factual sufficiency prong of our
analysis. (25) See In re J.F.C., 96 S.W.3d at 266 (noting that distinction between legal and factual
sufficiency when burden of proof is clear and convincing evidence "may be a fine one in some
cases"). Safeshred's second issue on appeal is overruled.


Amount of Punitive Damages

 In its third issue on appeal, Safeshred argues that the amount of exemplary damages
awarded in this case, $200,000, is excessive under the United States Constitution and Texas law. (26) 
Specifically, Safeshred argues that the award exceeds the substantive limitations imposed on an
award of punitive damages by the Due Process Clause of the Fourteenth Amendment to the United
States Constitution and recognized under Texas law. U.S. Const. Amend. XIV, § 1; see State Farm
Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003); Tony Gullo Motors, L.P. v. Chapa,
212 S.W.3d 299, 307-08 (Tex. 2006).

 In determining whether a punitive-damages award is constitutionally permissible, the
Supreme Court has identified three "guideposts" for courts to consider: (1) the nature or
"reprehensibility" of the defendant's conduct; (2) the ratio between exemplary and compensatory
damages; and (3) the size of civil penalties in comparable cases. Campbell, 538 U.S. at 418; BMW
of N. Am., Inc. v. Gore, 517 U.S. 559, 574-75 (1996); Chapa, 212 S.W.3d at 308.


Degree of Reprehensibility

 The Supreme Court has stated that the first guidepost, the degree of reprehensibility
of the defendant's conduct, is "the most important indicium of the reasonableness of a punitive
damages award." Gore, 517 U.S. at 575. The Supreme Court has identified five factors in
determining the degree of reprehensibility: (1) whether the harm caused was physical as opposed
to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of
the health or safety of others; (3) whether the target of the conduct was financially vulnerable;
(4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether harm
was the result of intentional malice, trickery, or deceit, or mere accident. Campbell, 538 U.S. at 419. 
The existence of any one of the factors weighing in favor of a plaintiff may not be sufficient to
sustain a punitive damages award, and the absence of all renders any award suspect. Id.

 In this case, the first factor weighs in favor of Martinez, as Safeshred's conduct
caused Martinez not only economic harm, but emotional and psychological harm as well. See
Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1283 (11th Cir. 2008) (finding first factor met
when plaintiff's relationships with his family suffered, he attended counseling after his termination,
and his termination made him feel hurt and upset). In this case, Martinez testified that Safeshred's
conduct caused him a great deal of stress and also caused him to lose sleep. (27) 

 The second factor, which involves an indifference to or reckless disregard to the
health or safety of others, also weighs in favor of Martinez. In this case, Wallace and Tooley acted
with indifference to Martinez's safety when they conditioned his employment on driving a load they
had reason to know was unsafe. The load's safety issues were later demonstrated in dramatic fashion
when stacks of steel on the flatbed trailer that Martinez had been asked to haul came crashing loose
through the rear window of the cab. This action could potentially have caused serious damage to
Martinez. See Campbell, 538 U.S. at 424 (instructing reviewing court to consider reprehensibility
in light of the harm potentially caused to plaintiff by defendant's acts). 

 The third factor inquires as to whether Martinez was financially vulnerable. The
evidence demonstrates that he was. He earned $12 per hour while working as a driver at Safeshred,
and this position was his only employment at the time. Further, Martinez testified that his
termination put pressure on his fiancée to work harder in order to provide for the family's two
children. Accordingly, this factor also weighs in favor of Martinez.

 The fourth factor involves whether the action constituted a repeated pattern of
behavior or an isolated incident, as "evidence that a defendant has repeatedly engaged in prohibited
conduct while knowing or suspecting that it was unlawful would provide relevant support for an
argument that strong medicine is required to cure the defendant's disrespect for the law." Gore,
517 U.S. at 576-77. In this case, Safeshred several times asked Martinez to drive a load despite its
being unsafe or illegal prior to the incident that led to his termination. Though Safeshred's prior
conduct does not involve other incidents of firing employees for failure to perform illegal acts,
"evidence of other acts need not be identical to have relevance in the calculation of punitive
damages." Campbell, 538 U.S. at 423-24. Accordingly, this factor also weighs in favor of Martinez.

 The fifth factor, involving whether the defendant's conduct was the result of
intentional malice, trickery, or deceit, tracks our analysis of malice above. Martinez presented
evidence that could reasonably lead to an inference that Safeshred acted with malice, including the
termination form filled out by Tooley that indicates that Martinez was terminated because he
"abandoned his job" and Tooley's testimony that he found Martinez's complaints regarding safety
and compliance issues "obstinate" and "insubordinate." However, Wallace testified that he believed
the load to be safe when he fired Martinez, and Tooley testified that he believed that Martinez had
not been fired. Given the conflicting accounts, we determine that this final factor does not weigh
strongly in favor of either party.

 Accordingly, we conclude that four of the five factors in this case weigh in Martinez's
favor, and thus the first guidepost supports the reasonableness of the punitive damages awarded by
the jury. 


Ratio

 The second guidepost requires us to compare the disparity between the punitive
damages award and the actual or potential harm suffered by Martinez. Campbell, 538 U.S. at 424. 
Though the Supreme Court has held that "few awards exceeding a single-digit ratio between punitive
and compensatory damages, to a significant degree, will satisfy due process," the Court has
repeatedly declined to "impose a bright-line ratio which a punitive damages award cannot exceed." 
Id. at 425. Indeed, the Court has recognized that "low awards of compensatory damages may
properly support a higher ratio than high compensatory awards if, for example, a particularly
egregious act has resulted in only a small amount of economic damages." Gore, 517 U.S. at 582.

 In this case, the ratio of punitive to compensatory damages is 11 to 1 when
compensatory damages for mental anguish and other non-economic losses are included, 26 to 1 when
they are not. Though the ratios move past the single digits, they are based on a low award of
compensatory damages for Safeshred's egregious conduct of repeatedly directing Martinez to break
the law and endangering his personal safety. See Campbell, 538 U.S. at 424 (considering harm
potentially caused to plaintiff). Further, we note that the Sabine Pilot exception is based on the
public-policy interest in deterring employers from firing employees for refusing to break the law, a
particular concern when the laws involve the safety of employees and the public at large. See Ran
Ken, 963 S.W.2d at 106; see also Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1338-39
(11th Cir. 1999) (upholding ratio of 100 to 1 and noting the state's strong interest in deterring the
corporate defendant's conduct of environmental pollution). Consequently, we conclude that this
guidepost does not undercut the reasonableness of the jury's award. 


Comparable Penalties

 Under the third guidepost, we compare the punitive damages amount to the civil
penalties that could have been imposed for comparable misconduct. The parties agree that there are
no directly comparable penalties for wrongful termination. When no comparable penalties exist,
numerous federal courts have looked to whether the punitive damages awarded comport with
statutory caps on damages, as damage caps "represent[] a legislative judgment similar to the
imposition of a civil fine." Zhang v. American Gem Seafoods, Inc., 339 F.3d 1020, 1045 (9th Cir.
2003); see also EEOC v. Federal Express Corp., 513 F.3d 360, 378 (4th Cir. 2008); Romano v.
U-Haul Int'l, 233 F.3d 655, 673 (1st Cir. 2000). 

 In this case, the jury awarded $250,000 in punitive damages. The trial court reformed
the award to $200,000, equaling the maximum amount of statutory damages allowed in this case
under the civil practice and remedies code. See Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b)
(West Supp. 2009). Numerous federal courts have held that "a punitive damages award that
comports with a statutory cap provides strong evidence that a defendant's due process rights have
not been violated." Romano, 233 F.3d at 673; see also Baty v. Willamette Indus., Inc., 172 F.3d
1232, 1245 (10th Cir. 1999) (rejecting contention that award of maximum damages allowable under
statutory cap is excessive). Accordingly, as the amount of punitive damages comports with the
statutory cap, the third guidepost favors Martinez.

 After reviewing the three guideposts, we conclude the jury's award of punitive
damages does not violate Safeshred's due process rights. Further, as we note in our analysis of the
third prong that the award is within the statutory range of damages available under Texas law, see
Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b), we conclude that the jury's award is permissible
under Texas law. Accordingly, Safeshred's third issue on appeal is overruled.



Compensatory Damages

 In its fourth and fifth issues on appeal, Safeshred argues that compensatory damages
for mental anguish and related emotional losses are not available under a Sabine Pilot cause of action
and that, even if available, the evidence is legally and factually insufficient to support the jury's
award of compensatory damages for mental anguish. We first address Safeshred's fifth issue, legal
and factual sufficiency.

 An award of compensatory damages for mental anguish will survive a legal
sufficiency challenge if the record contains direct evidence of the nature, duration, and severity of
the plaintiff's mental anguish, thus establishing a substantial disruption in the plaintiff's routine. 
Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995). If claimants fail to present direct
evidence of the nature, duration, and severity of their anguish, the appellate court conducts a
traditional no-evidence review. Id. In this review, the court determines whether the record contains
any evidence of a high degree of mental pain and distress that is more than mere worry, anxiety,
vexation, embarrassment, or anger. Id. We note, however, that "the absence of [evidence of the
nature, duration, and severity of mental anguish], particularly when it can be readily supplied or
procured by the plaintiff, justifies close judicial scrutiny of other evidence offered on this element
of damages." Id. 

 In this case, Martinez presented evidence that the ordeal was "very stressful" and
caused him to lose "a lot" of sleep. However, he did not present direct evidence of the precise
duration or severity of the mental anguish he suffered.

 Accordingly, we examine the record under a traditional no-evidence analysis for other
proof of a high degree of mental pain and distress that is more than mere worry. Woodruff,
901 S.W.2d at 444. A plaintiff may recover for mental anguish after providing evidence of "a mental
sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation,
wounded pride, shame, despair or public humiliation or a combination of any of these." Wal-Mart
Stores v. Odem, 929 S.W.2d 513, 528 (Tex. App.--San Antonio 1996, writ denied). However,
evidence that a plaintiff "was unable to sleep, was depressed, and suffered from anxiety . . . does not
rise to the level of compensable mental anguish under Texas law." Lefton v. Griffith, 136 S.W.3d
271, 279 (Tex. App.--San Antonio 2004, no pet.) (citation and quotations omitted); see also Saenz
v. Fidelity & Guar. Ins. Underwriters, 925 S.W.2d 607, 614 (Tex. 1996) (explaining that, though
plaintiff's concerns were both "real" and "understandable," they were not compensable under
Texas law). 

 In this case, Martinez presented evidence that he experienced sleeplessness, stress,
and anxiety due to hauling illegal loads, being fired, and being forced to search for another job. 
Although such emotions were certainly real and understandable under the circumstances, as in
Lefton, this evidence does not rise to the level of compensable mental anguish. 136 S.W.3d at 279. 
Accordingly, we uphold Safeshred's fifth issue on appeal and reverse the award of damages for
mental anguish. (28) 


 CONCLUSION

 We affirm the judgment of the trial court awarding $7,569.18 in economic damages
and $200,000 in exemplary damages. We reverse the judgment of the trial court awarding $10,000
in compensatory damages for non-economic losses, including mental anguish, and render judgment
that Martinez take nothing in non-economic compensatory damages.


__________________________________________

 Diane M. Henson, Justice

Before Justices Patterson, Puryear and Henson;

 Concurring and Dissenting Opinion by Justice Puryear

Affirmed in part; Reversed and Rendered in part

Filed: April 23, 2010
1. Safeshred does not appeal the award of economic damages for lost wages and benefits.
2. The facts recited herein are from the testimony and exhibits admitted at trial.
3. Safeshred and Safesite share a common owner, and the operations of the two companies
frequently overlap.
4. Wallace's testimony conflicts with Martinez's on this point. Wallace testified that
Martinez did not raise any safety or compliance issues to him prior to October 8, 2007.
5. Martinez testified that he kept a copy of TxDOT regulations with him when working and
a copy of the portions of the Code of Federal Regulations pertaining to commercial transportation
at his home.
6. Dunnage refers to material placed in gaps in loads to prevent the loads from shifting and
moving while in transit. 
7. Martinez took photographs of the cab and trailer to highlight these violations, and also took
photographs of the loads he was asked to haul on October 15th and October 17th. These
photographs were admitted into evidence at trial.
8. Martinez was not cited for any moving violations.
9. The citation also listed two additional violations, for a missing TxDOT insurance cab card
and an expired inspection certificate, that Martinez had not discovered in the course of his own
inspection.
10. During his testimony, Martinez noted that use of the damaged strap also violated two other
Federal Motor Carrier Safety Regulations. Section 393.100 contains similar content to section
393.106(b), stating that cargo must be "secured . . . to prevent shifting upon or within the vehicle to
such an extent that the vehicle's stability or maneuverability is adversely affected." 49 C.F.R.
§ 393.100 (2002). Section 393.104(b) specifically addresses the straps used to secure a load, stating,
"All tiedowns . . . must be in proper working order when used to perform that function with no
damaged or weakened components, such as, but not limited to, cracks or cuts . . . ." Id. § 393.104(b)
(2006). Martinez testified that he reviewed these regulations, in addition to section 393.106(b), prior
to driving the first load of steel shelving to Shertz.
11. The testimony of Tooley and Wallace conflict with Martinez's account. Tooley testified
that he never asked Martinez to drive to Abilene on October 9th. Wallace, on the other hand, 
testified that Martinez was asked to drive the cab to Abilene and initially agreed, indicating that he
knew how to avoid any "DPS places" on the way. Wallace went on to testify, "I believe [Martinez
eventually] refused to take [the cab to Abilene] because he didn't want to take the $24,000 check"
to pay for the belly-dump trailer. Despite these conflicts, all witnesses agree that Martinez did not
drive the cab on October 9th, but instead made the trip to Abilene on October 16th, after the cab had
been brought into compliance with federal and state regulations.
12. Martinez admitted at trial that the fact that the steel was hanging off of the back of the
flatbed trailer by three feet was not a violation of any federal or state regulations.
13. Tooley testified that he and Martinez spoke before Martinez started out with the load on
the 17th, but that they did not discuss safety or compliance issues.
14. Dalton Wallace is the owner of Safesite and Safeshred. Dalton Wallace testified that he
has "hauled thousands of loads" in his long career in commercial transportation and "know[s] what
a safe load is," but also admitted that he had never obtained a commercial driver's license.
15. Wallace testified that he knew at the time of the phone call that his father, Tooley, and
Saul Reyes, the employee who loaded the flatbed trailer, were all unfamiliar with the regulations
governing flatbed trailers. In addition, Kroll, the only licensed commercial driver besides Martinez
at the site, testified that he could not remember when he had last reviewed DPS or federal regulations
regarding the loading of flatbed trailers.
16. Wallace testified that Martinez told him that the load was unsafe, but specified only that
the load was hanging too far off of the back of the trailer.
17. Wallace agreed, testifying at trial that "I terminated [Martinez] from a restaurant" and "I
did fire him."
18. We note that traditional legal and factual-sufficiency standards of review vary when
evaluating factual findings under a clear-and-convincing standard of proof. See In re J.F.C.,
96 S.W.3d 256, 266 (Tex. 2002). Under the clear-and-convincing standard, we inquire whether a
reasonable trier of fact could have formed a firm belief or conviction that its finding was true. Id.
19. While the Texas Supreme Court recognized a second public-policy exception for
termination due to an employer's desire to avoid paying pension benefits, the court's decision was
reversed by the United States Supreme Court on the basis of ERISA preemption. See McClendon
v. Ingersoll-Rand Co., 779 S.W.2d 69 (Tex. 1989), reversed, 498 U.S. 133 (1990).
20. The Anti-Retaliation statute, formerly codified as Tex. Rev. Civ. Stat. Ann. art. 8307c, has
been recodified as Tex. Lab. Code Ann. §§ 451.001-.003 (West 2006). See City of LaPorte
v. Barfield, 898 S.W.2d 288, 293 & n.9 (Tex. 1995) (indicating that Article 8307c was recodified
without substantive change).
21. More specifically, Safeshred argues that the court in Lisanti v. Dixon concluded that
Sabine Pilot claims sound in contract rather than tort. 147 S.W.3d 638 (Tex. App.--Dallas 2004,
pet. denied). The Lisanti court, however, did not reach the issue. Lisanti also involved the question
of whether an independent tort was required to support an award of punitive damages in a Sabine
Pilot case. Id. at 645. Though the court noted that "Lisanti's argument focuses on his contention
that [plaintiff's] Sabine Pilot claim is contractual in nature rather than a tort," the court went on to
explain that "Lisanti fails to address . . . the fact that Dixon's petition included a claim for assault,"
which qualified as an independent tort. Id. Accordingly, the court decided the issue without
resolving whether a Sabine Pilot claim sounded in tort or contract.
22. Safeshred argues that, regardless of whether a Sabine Pilot claim sounds in tort or contract, 
two applicable Texas cases indicate that an independent tort must be proven in order to recover
punitive damages in a retaliatory-discharge case. See Federal Express Corp. v. Dutschmann,
846 S.W.2d 282 (Tex. 1993); Nagel Mfg. & Supply v. Ulloa, 812 S.W.2d 78 (Tex. App.--Austin
1991, writ denied). Both Dutschmann and Nagel, however, were sexual-harassment claims brought
under a former version of the Texas Commission on Human Rights Act, under which the legislature
specifically provided for the recovery of actual damages and equitable relief, but not punitive
damages. See former Tex. Rev. Civ. Stat. Ann. art. 5521K (Vernon 1987), repealed by Act of
May 12, 1993, 73rd Leg., R.S., ch. 269, § 5(1), 1993 Tex. Gen. Laws 987, 1273; see also Whole
Foods Mkt. Sw., L.P. v. Tijerina, 979 S.W.2d 768, 781 n.12 (Tex. App.--Houston [14th Dist.] 1998,
pet. denied) (discussing Dutschmann and Nagel). Accordingly, these cases do not bear on the issue
of whether punitive damages are available under either the Anti-Retaliation statute or the Sabine
Pilot public-policy exception. See id. at 780-81 (describing argument that Dutschmann governed
availability of punitive damages under Anti-Retaliation statute as "meritless").
23. The definition of malice submitted to the jury tracks neither the definition used in cases
under the Anti-Retaliation statute, see Continental Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444,
452-54 (Tex. 1996) (requiring "actual malice" and defining it as "ill-will, spite, evil motive, or
purposing the injuring of another"), nor the definition currently provided in the civil practice and
remedies code, see Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7) (West 2008) (identical to part (a)
of definition given to jury but omitting part (b)). Rather, the definition resembles the two-pronged
version in place in the civil practice and remedies code from 1995 to 2003, with the first prong
consisting of specific intent, and the second prong consisting of gross negligence. See Ancira
Enters., Inc. v. Fischer, 178 S.W.3d 82, 93 (Tex. App.--Austin 2005, no pet.) (citing Transportation
Ins. Co. v. Moriel, 879 S.W.2d 10, 23 (Tex. 1994)). However, since neither party objected to this
instruction, we are bound to review the evidence in light of the definition actually given to the jury. 
City of Fort Worth v. Zimlich, 29 S.W.3d 62, 71 (Tex. 2000).
24. Though the testimony of Martinez, Wallace, and Tooley conflicted on a number of issues, 
a reasonable juror could resolve the conflicting testimony in favor of Martinez. See E.I. du Pont de
Nemours & Co. v. Robinson, 923 S.W.2d 549, 560 (Tex. 1995) (explaining that jury is "the sole
judge of the credibility of the witnesses and the weight to be given their testimony") (quotation and
citation omitted). 
25. We further note that there is also significant evidence of malice under part (a) of the
definition submitted to the jury, which involves "a specific intent by Donald Wallace or Kirk Tooley
to cause substantial injury to Louis Martinez." The evidence presented by Martinez indicates a
consistent pattern of behavior on the part of Wallace and Tooley in requesting or ordering him to
perform illegal acts, culminating in Martinez's termination. Such a pattern of behavior may serve
as evidence of a specific intent to cause harm to an employee. Whole Foods, 979 S.W.2d at 780. 
Further, Tooley's testimony that he found Martinez's voicing of safety concerns "obstinate" and
"insubordinate," combined with the fact that Tooley both noted in company records and testified 
that Martinez had "abandoned his job" when all circumstances pointed towards the fact that Martinez
had been fired, also constitute evidence of a specific intent to harm Martinez. See Bennett v.
Reynolds, 242 S.W.3d 866, 895 (Tex. App.--Austin 2007, pet. granted) (noting that falsity and
fabrication concerning relevant events may evince malice).
26. The jury awarded punitive damages in the amount of $250,000, which was reformed by
the trial court to an award of $200,000 to conform with the statutory cap under the civil practice and
remedies code. See Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (West Supp. 2009). 
27. Although we reverse the jury's awards of damages for mental anguish infra, such a ruling
does not bar us from considering non-economic harm in this analysis. See United States EEOC v.
W&O, Inc., 213 F.3d 600, 614 (11th Cir. 2000) (explaining that, "while the employees received
[only] economic remedies, the harm was not necessarily purely economic," but also included 
violation of employees' civil rights and "infliction of worry and emotional upset").
28. As we reverse the mental-anguish award on evidentiary sufficiency grounds under
Safeshred's fifth issue on appeal, we do not address Safeshred's fourth issue on appeal, which asserts
that damages for mental anguish are not available in a Sabine Pilot cause of action. We note,
however, that Safeshred's briefing on this issue centers on the contention that a Sabine Pilot action
sounds in contract, an argument we rejected in deciding Safeshred's first issue on appeal.